Thomas E. Hill (SBN 100861)
Email: tehill@reedsmith.com
Marytza J. Reyes (SBN 218684)
Email: mjreyes@reedsmith.com
Mara D. Matheke (SBN 268869)
Email: mmatheke@reedsmith.com
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071-1514
Telephone: (213) 457-8000
Facsimile: (213) 457-8080

Attorneys for Defendants
HOBART SERVICE, a division of ITW
Food Equipment Group, LLC, and ITW
FOOD EQUIPMENT GROUP, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSELUIS ALCANTAR, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>HOBART SERVICE, HOBART FOOD EQUIPMENT GROUP, ITW FOOD EQUIPMENT GROUP LLC and Does 1 through 100, inclusive,<br><br>Defendants. | Case No.: EDCV11-1600-PSG (SPx)<br><br>[Honorable Philip S. Gutierrez]<br><br>**DEFENDANTS' COMPENDIUM OF EVIDENCE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date: December 17, 2012<br>Time: 1:30 p.m.<br>Place: Court Room 880<br><br>Compl. Filed: October 5, 2011<br>Trial Date: January 22, 2013<br><br>[Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities; and Separate Statement Filed Concurrently Herewith.] |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  TO THE CLERK OF THE COURT AND TO PLAINTIFF AND TO HIS

2  ATTORNEYS OF RECORD:

3  PLEASE TAKE NOTICE that Defendants Hobart Service, a division of ITW

4  Food Equipment Group, LLC, and ITW Food Equipment Group, LLC ("Defendants")

5  hereby submit this Compendium of Evidence ("COE") in support of their Motion for

6  Summary Judgment or, in the Alternative, Partial Summary Judgment.  The exhibits

7  in this COE are referenced and authenticated in the declaration of Thomas E. Hill and

8  the depositions of Plaintiff Joseluis Alcantar and Michael Jewett also contained in this

9  COE.  The evidentiary documents and materials specifically submitted by Defendants

10 are as follows:

| TAB NAME / EXH. NO. | TAB / EXH. DESCRIPTION |
|---|---|
| Exhibit 1 | Excerpts from the July 31, 2012 deposition of Plaintiff Joseluis Alcantar |
| Exhibit 2 | Service Technician Rules and Understandings |
| Exhibit 3 | Excerpts from the August 2, 2012 deposition of Michael Jewett |
| Exhibit 4 | Declaration of Dawn Barhorst |
| Exhibit 5 | Declaration of Thomas E. Hill |
| Exhibit 6 | Personnel Policies and Procedures for Field Operations Non-Exempt Employees |

Dated: October 29, 2012                    REED SMITH LLP


By /s Thomas E. Hill
    Thomas E. Hill
    Attorneys for Defendants
    HOBART SERVICE, a division of ITW
    FOOD EQUIPMENT GROUP, LLC, and
    ITW FOOD EQUIPMENT GROUP, LLC

DEFENDANTS' COMPENDIUM OF EVIDENCE IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOSE LUIS ALCANTAR, on behalf )
of himself and all others )
similarly situated, )
)
            Plaintiff, )
)
    vs. ) Case No.
) 5:11-CV-1600-PSG(SPX)
HOBART SERVICE; HOBART FOOD )
EQUIPMENT GROUP; ITW FOOD )
EQUIPMENT GROUP, LLC; and DOES )
1 through 100, Inclusive )
)
            Defendants. )
_____ )

DEPOSITION OF JOSE LUIS ALCANTAR

Los Angeles, California

Tuesday, July 31, 2012

Reported by:  Linda D. White
              CSR No. 12009
NDS Job No.:  147101

Page 9

1        A.    I believe it was around '02 or '03.

2        Q.    And prior to commencing residence at the

3   Beaumont address that you gave me, where you currently

4   reside, where did you reside?

5        A.    It was 1123 -- or 11 -- no.  I'm trying to

6   think of the number now.  But it was Brushwood Avenue in

7   Imperial, California.

8        Q.    Okay.  And how long did you reside at the

9   Brushwood address in Imperial, California?

10       A.    I'd say, '95 to when I left to move, so to

11   '02.  Somewhere in there.

12       Q.    And did you reside at the Brushwood Avenue

13   address in Imperial, California, at all times prior to

14   moving to the Beaumont residence?

15       A.    Well, I rented a house on Golf Avenue in

16   Beaumont while the other house was getting built, yeah,

17   so.

18       Q.    When did you -- by whom are you currently

19   employed?

20       A.    Hobart Corporation.

21       Q.    And when did you commence employment with

22   Hobart?

23       A.    I believe it was '94.

24       Q.    And when you commenced employment with Hobart,

25   where did you reside?

Page 10

1       A.    In the Brush -- yeah, the Brushwood address.

2       Q.    Okay.  Throughout your employment with Hobart,

3   have you only resided at the Brushwood address in

4   Imperial, California, and the two addresses in Beaumont

5   that you gave me?

6       A.    Yeah, I'm pretty sure.  I'm trying to think if

7   I was staying with my mother-in-law when I got hired

8   with Hobart, which is in El Centro.  It's 877 Scott

9   Avenue.

10      Q.    Okay.  Is it your best recollection, as you

11  sit here this morning, that the only three cities that

12  you have lived in, that you've resided in since

13  commencing employment with Hobart were El Centro,

14  Imperial, and Beaumont, California?

15      A.    Correct.

16      Q.    Okay.  Now, I believe you told me that you're

17  currently employed by Hobart Corporation?

18      A.    Yes, part of ITW.

19      Q.    And that you commenced employment with Hobart

20  in 1994?

21      A.    I believe it -- that's -- I believe that was

22  the year.

23      Q.    Okay.  And when you were first hired by

24  Hobart, in what position were you hired into?

25      A.    As a technician.  I'm not sure if it was a

Network Deposition Services, Inc. • networkdepo.com • 866-NET-DEPO

1    technician I or II.  It was just, a service technician.

2        Q.   And what's your current position with the

3    company?

4        A.   Service technician IV, yeah.

5        Q.   How many categories of service technician

6    exist at Hobart?

7        A.   I believe there's a tech v but that's, like,

8    for a foreman.

9        Q.   Okay.  Have you been employed as a service

10   technician in one category or another at all times since

11   commencing employment with Hobart?

12       A.   Correct, yes.

13       Q.   Did you go through all of the ranks from

14   service technician I up to service technician IV?

15       A.   Right, yes.

16       Q.   So you were hired as a service technician I

17   and eventually promoted to service technician II?

18       MS. WORKMAN:  Objection.  To the extent it

19   misstates your testimony.

20            But if you recall what position you were

21   hired in.

22       THE WITNESS:  Oh, I don't -- I'm trying to think if

23   it was a tech I or tech II.  I don't know.

24   BY MR. HILL

25       Q.   Okay.

Page 13

1    along too fast.  So I'm going to say, yeah, more than a

2    year.

3         Q.   Okay.  Have you been continuously employed by

4    Hobart as a service technician since being hired by the

5    company in 1994?

6         A.   Yes.

7         Q.   Have you worked for any other entity other

8    than Hobart since 1994?

9         A.   No.

10        Q.   Have you been employed in any position other

11   than that of service technician by Hobart since 1994?

12        A.   I do, like, part-time photography as a hobby

13   thing, but that's all I do.

14        MS. WORKMAN:  I think what he asked you, if you'd

15   been employed in any other position at Hobart.

16        THE WITNESS:  At Hobart, no.  I'm sorry.  No.

17   BY MR. HILL

18        Q.   So the only position that you've held at

19   Hobart --

20        A.   Is a tech.

21        Q.   And that's true throughout your employment

22   with the company?

23        A.   Yes, it is.

24        Q.   Mr. Alcantar, do you currently work out of a

25   particular branch office?

Page 14

```
 1      A.   Yes.  Ontario, California.
 2      Q.   And do you have a direct supervisor?
 3      A.   Yes, that would be Mark Miller.
 4      Q.   Mark Miller?
 5      A.   Is the branch manager.
 6      Q.   Do you spell Miller, M-I-L-L-E-R?
 7      A.   Correct.
 8      Q.   And Mr. Miller is the branch manager in
 9 Ontario?
10      A.   Yes.
11      Q.   How long have you worked out of that
12 particular branch office?
13      A.   Since they opened it back up.  It's been
14 opened back up about two years, I believe.
15      Q.   And during that period of time, has Mr. Miller
16 always been the branch manager of that branch?
17      A.   No.
18      Q.   Prior to Mr. Miller, who was the branch
19 manager of the Ontario branch office?
20      A.   Julie Evans.
21      Q.   And when Julie Evans was the branch manager of
22 the Ontario branch office, did you report directly to
23 her?
24      A.   Yes.
25      Q.   She was your supervisor?
```

1      A.   Yes.  Ontario, California.

2      Q.   And do you have a direct supervisor?

3      A.   Yes, that would be Mark Miller.

4      Q.   Mark Miller?

5      A.   Is the branch manager.

6      Q.   Do you spell Miller, M-I-L-L-E-R?

7      A.   Correct.

8      Q.   And Mr. Miller is the branch manager in

9  Ontario?

10      A.   Yes.

11      Q.   How long have you worked out of that

12  particular branch office?

13      A.   Since they opened it back up.  It's been

14  opened back up about two years, I believe.

15      Q.   And during that period of time, has Mr. Miller

16  always been the branch manager of that branch?

17      A.   No.

18      Q.   Prior to Mr. Miller, who was the branch

19  manager of the Ontario branch office?

20      A.   Julie Evans.

21      Q.   And when Julie Evans was the branch manager of

22  the Ontario branch office, did you report directly to

23  her?

24      A.   Yes.

25      Q.   She was your supervisor?

1       A.    Yes.

2       Q.    Now, you said that the Ontario branch office

3   reopened and it's -- and your best estimate of how long

4   it's been open since it reopened, is a couple of years,

5   correct?

6       A.    Yeah.

7       Q.    How long has Mr. Miller been the branch

8   manager there?

9       A.    Since November 1st, I believe.

10      Q.    Of 2011?

11      A.    Yeah, last year.

12      Q.    And prior to Mr. Miller's becoming the branch

13  manager on November 1 of 2011, was Ms. Evans the branch

14  manager?

15      A.    Yes.

16      Q.    And had she been the branch manager at all

17  times since the Ontario branch was reopened?

18      A.    Yes.

19      Q.    Now, during your employment with Hobart, have

20  you worked out of any other branch office?

21      A.    I helped with San Diego at one time.

22  Sometimes you loan a technician, like, if they're short,

23  so they'll borrow somebody to go take care of calls in

24  another area.  But other than that, no.

25      Q.    You've always worked out of the Ontario branch

1   office?

2       A.   No.  Before that, it was San Bernardino.

3       Q.   And when did you work in the San Bernardino

4   branch office?

5       A.   2002 and probably forward, around that time

6   frame.

7       Q.   What caused you -- did you -- when you left --

8   when you ceased working out of the San Bernardino branch

9   office, that's when you commenced working out of the

10  Ontario branch office?

11      A.   No.  They didn't have an office.  What they

12  did is, they closed that office and made everybody,

13  basically, work out of their houses.  They didn't have

14  an office.  They set up an office in Buena Park as far

15  as administrative, but we didn't have an office to

16  go to.

17      Q.   Okay.  Well, let's go back.  You're working

18  out of the San Bernardino branch office.

19      A.   Right.

20      Q.   And I think you said that you started in or

21  about 2002?

22      A.   Uh-huh.

23      Q.   Okay.  How long did you work out of that

24  branch office?

25      A.   Until it closed.

1  office?

2       A.   No.  Before that, it was San Bernardino.

3       Q.   And when did you work in the San Bernardino

4  branch office?

5       A.   2002 and probably forward, around that time

6  frame.

7       Q.   What caused you -- did you -- when you left --

8  when you ceased working out of the San Bernardino branch

9  office, that's when you commenced working out of the

10 Ontario branch office?

11      A.   No.  They didn't have an office.  What they

12 did is, they closed that office and made everybody,

13 basically, work out of their houses.  They didn't have

14 an office.  They set up an office in Buena Park as far

15 as administrative, but we didn't have an office to

16 go to.

17      Q.   Okay.  Well, let's go back.  You're working

18 out of the San Bernardino branch office.

19      A.   Right.

20      Q.   And I think you said that you started in or

21 about 2002?

22      A.   Uh-huh.

23      Q.   Okay.  How long did you work out of that

24 branch office?

25      A.   Until it closed.

```
 1        Q.   How long was that?

 2        A.   It had to be a good eight years, I imagine.

 3        Q.   So from, say, 2002 to 2010?

 4        A.   It would have to be less.  It would be six.

 5   I think it would be six.  I've only been here nine

 6   years, so I've got.

 7        MS. WORKMAN:  He's entitled to your best estimate,

 8   but he doesn't want you to just guess.

 9        THE WITNESS:  No, no.  I'm not guessing.  I'm

10   trying to calculate.  Okay.  Well, this has been open

11   for a year.

12   BY MR. HILL

13        Q.   I don't want you to guess but I'm entitled to

14   your best estimate.  And it -- you know, I'm entitled to

15   your best estimate even if it's frustrating, you know,

16   to try to think back and recover.

17        A.   No, no, that's fine.

18        Q.   So take your time and give me your best

19   testimony.  So is it your best recollection that you

20   commenced working out of the San Bernardino branch

21   office in 2002?

22        A.   Yes.

23        Q.   And you continued to work out of that branch

24   office, that is, the San Bernardino branch office until

25   that office closed?
```

1      A.    Correct.

2      Q.    And did that San Bernardino branch office

3   close at the same time the Ontario branch office closed?

4      A.    The Ontario office didn't exist when the San

5   Bernardino office closed.

6      Q.    Okay.   Did the Ontario branch office exist at

7   any time while you were working out of the San

8   Bernardino branch office?

9      A.    No.

10     Q.    Okay.   Now, after the San Bernardino branch

11   office closed, how long was it before you started

12   working out of the Ontario branch office?

13     A.    I think we were about a year without a shop,

14   basically.

15     Q.    So for approximately one year, you weren't

16   affiliated with any particular branch office?

17     A.    Well, they assigned us to Buena Park, but

18   I went there once or twice the entire time.

19     Q.    Okay.   During that one-year period between

20   your working out of the San Bernardino office and your

21   commencing work out of the Ontario office, was there a

22   branch manager at the Buena Park branch?

23     A.    Yeah, it was Mike Nemec, N-E-M-E-C.

24     Q.    And during that period of time while you were,

25   sort of, between branch offices and reporting to Buena

Page 18

1     A.    Correct.

2     Q.    And did that San Bernardino branch office

3    close at the same time the Ontario branch office closed?

4     A.    The Ontario office didn't exist when the San

5    Bernardino office closed.

6     Q.    Okay.  Did the Ontario branch office exist at

7    any time while you were working out of the San

8    Bernardino branch office?

9     A.    No.

10    Q.    Okay.  Now, after the San Bernardino branch

11   office closed, how long was it before you started

12   working out of the Ontario branch office?

13    A.    I think we were about a year without a shop,

14   basically.

15    Q.    So for approximately one year, you weren't

16   affiliated with any particular branch office?

17    A.    Well, they assigned us to Buena Park, but

18   I went there once or twice the entire time.

19    Q.    Okay.  During that one-year period between

20   your working out of the San Bernardino office and your

21   commencing work out of the Ontario office, was there a

22   branch manager at the Buena Park branch?

23    A.    Yeah, it was Mike Nemec, N-E-M-E-C.

24    Q.    And during that period of time while you were,

25   sort of, between branch offices and reporting to Buena

1  Park --

2      A.   Correct.

3      Q.   -- did you report to Mr. Nemec?

4      A.   Yes.

5      Q.   Was he your direct supervisor?

6      A.   Yes.

7      Q.   All right.  Prior to your commencing work out

8  of the San Bernardino branch office, did you work for

9  Hobart out of another branch office?

10     A.   Yes.

11     Q.   What was that?

12     A.   San Diego.

13     Q.   Let me go back to your work out of the San

14  Bernardino branch office.  To whom did you report when

15  you worked out of the San Bernardino branch office?

16     A.   For a period, Mike Nemec was there.  But

17  before him, was Van Stell, V-A-N; S-T-E-L-L, and he's

18  deceased.

19     Q.   At the time the San Bernardino branch office

20  closed, was Mike Nemec the branch manager there?

21     A.   Yes.

22     Q.   And prior to Mike Nemec becoming the branch

23  manager at San Bernardino, was Van Stell the branch

24  manager there?

25     A.   Yes.

Page 23

1      Q.    And that, for some period of time,

2  comparatively short period of time, you were between

3  branch offices -- in my terminology, not yours -- and

4  you worked out of the Buena Park administrative office?

5      A.    Right.

6      Q.    Okay.  Is it also accurate to say that the

7  only direct supervisors who you've had since commencing

8  employment with Hobart are Amy Dougherty, Mike Deeter,

9  Mike Nemec, Julie Evans, and Mike Miller?

10     A.    Yes.

11     Q.    Do you know how many miles it is from your --

12  best estimate, from your home in Beaumont to the Ontario

13  office?

14     A.    I'm going to say about 30.

15     Q.    Okay.  Mr. Alcantar, how are you currently

16  compensated by Hobart?

17     A.    Hourly wage.

18     Q.    Hourly wage.  And have you always been

19  compensated on an hourly wage basis since commencing

20  employment with Hobart?

21     A.    Yes.

22     Q.    Have you ever been compensated on a salary

23  basis?

24     A.    No.

25     Q.    What is your current hourly rate?

Network Deposition Services, Inc. • networkdepo.com • 866-NET-DEPO

1-15

1       Q.   And that, for some period of time,

2   comparatively short period of time, you were between

3   branch offices -- in my terminology, not yours -- and

4   you worked out of the Buena Park administrative office?

5       A.   Right.

6       Q.   Okay.  Is it also accurate to say that the

7   only direct supervisors who you've had since commencing

8   employment with Hobart are Amy Dougherty, Mike Deeter,

9   Mike Nemec, Julie Evans, and Mike Miller?

10      A.   Yes.

11      Q.   Do you know how many miles it is from your --

12  best estimate, from your home in Beaumont to the Ontario

13  office?

14      A.   I'm going to say about 30.

15      Q.   Okay.  Mr. Alcantar, how are you currently

16  compensated by Hobart?

17      A.   Hourly wage.

18      Q.   Hourly wage.  And have you always been

19  compensated on an hourly wage basis since commencing

20  employment with Hobart?

21      A.   Yes.

22      Q.   Have you ever been compensated on a salary

23  basis?

24      A.   No.

25      Q.   What is your current hourly rate?

Page 24

1      A.    I believe it's $25.61.

2      Q.    Do you recall what your hourly rate was when

3  you first commenced employment with Hobart?

4      A.    I believe it was around $17.

5      Q.    Are you currently eligible to receive any form

6  of compensation from Hobart other than your hourly wage?

7      A.    No, not that I know of.  I mean, all I get is

8  my hourly wage.

9      Q.    Okay.  You don't receive commissions of any

10  sort?

11      A.    If you sell a contract to a customer for a

12  maintenance service agreement, you know, they may give

13  you, like, a $25 gift certificate or something.  But

14  other than that, nothing major.

15      Q.    Well, whether it's major or minor, I need to

16  know about it.

17      A.    Okay.

18      Q.    Okay.

19      A.    But yes, I.

20      Q.    So let me go back.  And I need to -- I'm

21  asking you about every form of compensation that you're

22  eligible, you know, to receive.  Then we'll ask you

23  about whether you ever received it.  But let's just

24  start with, as a service technician, you obviously are

25  entitled to your hourly wage for the hours you work,

1    correct?

2        A.    Correct.

3        Q.    Is there any other form of compensation that

4    you can earn as a service technician?

5        MS. WORKMAN:  And he's including the things that

6    you just described, like.

7        THE WITNESS:  The SPIFFs.  I mean, if you sell a

8    service contract, they give you, I think, $25 for every

9    $1,000 worth of.

10       MS. WORKMAN:  That's an acronym, S-P-I-F-F-S.

11   BY MR. HILL:

12       Q.    You used the terminology SPIFF.  What is a

13   SPIFF?

14       A.    Basically, it's just a reward for selling a

15   contract.

16       Q.    Okay.  So this $20 gift certificate that you

17   referenced earlier in your testimony, that you might

18   receive for selling a service contract, would that be a

19   SPIFF?

20       A.    Yes.

21       Q.    Are there any other types of SPIFFs that you

22   can earn as a service technician?

23       A.    No.

24       Q.    Okay.  Is it fair, then, to say that the only

25   type of SPIFF that you're eligible to receive as a

1    service technician is this commission payment on a

2    service contract?

3        A.    Yes.

4        Q.    And I think you testified -- and again, if I'm

5    wrong, you correct me -- that you believe you get -- the

6    SPIFF that can be earned for the sales of a service

7    contract is 20 bucks for every $1,000?

8        A.    I said $25.

9        Q.    $25.  Okay.  Is that your understanding of

10   what you're eligible to receive for the sale of a

11   service contract?

12       A.    That's my current understanding, yes.

13       Q.    $25 for every $1,000 --

14       A.    Yeah.

15       Q.    -- of sales revenue?

16       A.    Right.

17       Q.    Is -- what's a typical service contract, if

18   there is such a thing, run in terms of sales revenue?

19       MS. WORKMAN:  Object to the extent it may lack

20   foundation.

21           But you can testify to the extent you know.

22       THE WITNESS:  Most of the time -- it depends on the

23   equipment, how old it is.  If it's a major contract,

24   like you're taking care of a whole building, that's --

25   we're talking different things.  But most of the time,

Page 27

1    it may be like a dough mixer.  I'm going to say a dough

2    mixer, $600.

3    BY MR. HILL

4         Q.   Okay.  Have you ever been paid a SPIFF?

5         A.   Yes.

6         Q.   Does that happen frequently?

7         A.   No.

8         Q.   In the last year, how many SPIFFs do you think

9    you've earned?

10        A.   I haven't earned any.

11        Q.   In your career with Hobart, can you give me

12   your best estimate as to how many SPIFFs you've earned?

13        A.   I'm going to say around $300 at the most.

14   That's mostly with Van Stell and Amy.

15        Q.   Mostly while you were in San Diego?

16        A.   Yes.

17        Q.   Do you recall whether you've ever earned a

18   SPIFF since leaving San Diego?

19        A.   Van Stell.  He's the San Bernardino office.

20        Q.   I'm sorry.  Okay.

21        A.   Yes.

22        Q.   How about in Ontario, have you -- do you

23   recall earning a SPIFF while in Ontario?

24        A.   Yes.  I'm pretty sure I had -- it wasn't --

25   there was one under Julie Evans' supervision.

Page 28

1      Q.    What's the highest-value SPIFF you've ever

2   earned?

3      A.    Most of the time, it's, like, a $50 gift

4   certificate.

5      Q.    When you say a gift certificate, a gift

6   certificate to a particular business?

7      A.    Well, they ask you what -- if you say Home

8   Depot, they'll give you a Home Depot card.

9      Q.    Have all the SPIFFs you've received been

10  related to the sale of sales contracts?

11     A.    Well, when Van Stell was in charge, I would

12  see "award" on some of the paychecks.  It would say,

13  like, $50 award.  I never asked why he did it.  I'm sure

14  I was doing a good job for him.  So he made -- "Okay, he

15  did a good job."  He'd throw it in there.

16     Q.    Okay.  So some of the SPIFFS -- were any of

17  the SPIFFS you received related to the sale of a

18  contract to a customer?

19     A.    Yes.

20     Q.    Okay.  But there may have been some SPIFFS you

21  received that were just, sort of, attaboys?

22     A.    Exactly, yes.

23     Q.    Did you ever receive anything in writing from

24  anyone at Hobart explaining how you could earn SPIFFs?

25     A.    No.

1     Q.   So your reference to the paper ticket was that

2     you could use the paper ticket as a resource to fill out

3     the timesheet?

4     A.   Yes.

5     Q.   Did you ever receive any instruction from

6     Hobart that you were required to keep accurate time

7     records?

8     A.   No.   They just tell you, you know -- like

9     right now, I do a back-up of my timesheet.   They didn't

10    tell me to do a back-up.   It's just common sense.

11    Q.   Was it also, you know, common sense to you

12    that you should keep accurate time records?

13    A.   Yes.

14    Q.   Okay.   And has that been true throughout your

15    time with Hobart?

16    A.   Yes.

17    Q.   And have you always endeavored to keep

18    accurate time records?

19    A.   Yes.

20    Q.   When you complete a time record, whether it's,

21    you know, back when you used the paper time records or

22    now with the Excel spreadsheet, do you and did you at

23    some point have to deliver those time records to

24    somebody?

25    A.   I emailed them.

Page 42

1    A.   Yes.

2        Q.   Have you ever been counseled by anyone at

3    Hobart for not accurately completing your time records?

4        A.   Yes.

5        Q.   Have you ever been counseled by anyone at

6    Hobart for not recording all of your overtime on your

7    time records?

8        A.   Yes.

9        Q.   Who counseled you in that regard?

10       A.   Just Julie Evans.

11       Q.   And why did she counsel you?

12       A.   Well, she basically -- she wrote me up, is

13   what she did.  It wasn't -- there wasn't no counseling.

14   They wrote me up for -- I guess, for saying the records

15   were inaccurate.

16       Q.   Did Ms. Evans also counsel you for working

17   unauthorized overtime?

18       A.   Yes.

19       Q.   And do you recall being disciplined by Hobart

20   for not accurately completing your time records?

21       A.   Yes.

22       Q.   Do you recall being disciplined by Hobart for

23   not including all of your overtime on your time records?

24       A.   Yes.

25       Q.   Do you recall being disciplined by Hobart for

1    working unauthorized overtime?

2         A.   Yes.

3         Q.   And did that discipline involve a three-day

4    suspension?

5         A.   Yes.

6         Q.   Did that occur in or about June of 2011?

7         A.   June 21st through 23rd.

8         MR. HILL:  We've been going for about an hour.

9    Sometimes people want a break at that point in time.

10   You let me know if you want one.  Otherwise --

11        MS. WORKMAN:  I would like one.

12        MR. HILL:  Okay.

13        MS. WORKMAN:  Okay.

14                   (A break was taken)

15   BY MR. HILL:

16        Q.   Mr. Alcantar, could you please describe for me

17   generally, your duties and responsibilities as a service

18   technician?

19        A.   I just basically fix equipment.

20        Q.   Okay.  And what type of equipment do you fix?

21        A.   Anything in the scale side, for the most part.

22        Q.   Okay.  And describe for me again what you mean

23   when you refer to the scale side.

24        A.   It would be service scales, like counter

25   scales as you find at like Stater Brothers, Vons on the

```
 1    deli counters.  Meet wrapping equipment that you would
 2    find in the backroom in a meat room.  And that's
 3    basically -- there's different systems, but -- there's
 4    wrapping systems with scales and there's basic service
 5    scales.
 6        Q.   Okay.
 7        A.   There are different models.
 8        Q.   Okay.  So when you say you fix equipment,
 9    basically you're fixing counter scales or meat wrapping
10    systems?
11        A.   Yes.
12        Q.   Okay.  And is there a typical type of business
13    that uses that type of equipment?
14        MS. WORKMAN:  Object that it's vague and ambiguous.
15            But you can answer.
16        THE WITNESS:  For the most part, I respond to
17    mostly grocery stores.
18    BY MR. HILL:
19        Q.   Grocery stores.  What percentage of your
20    assignments would you estimate are to service equipment
21    at grocery stores?
22        A.   I'm going to say 90 percent.
23        Q.   And are these pursuant to service contracts
24    that the grocery stores have with Hobart?
25        A.   Some --
```

Page 48

1      A.   Yes.

2      Q.   Okay.  Has that generally been true throughout

3  your employment with Hobart?

4      MS. WORKMAN:  Object that it's vague and ambiguous.

5           But you may respond.

6      THE WITNESS:  For the most part, yes.

7  BY MR. HILL:

8      Q.   And how do you receive subsequent

9  assignments -- strike that.

10          Is it usual that you'll have more than one

11  assignment on any given workday?

12     A.   Yes.

13     Q.   Okay.  Again, in a typical day, an average

14  day, how many assignments would you get?

15     A.   Three calls.

16     Q.   Three calls.  Three calls is sort of a

17  standard typical day?

18     A.   Yes.

19     Q.   Okay.  And on that standard typical day, how

20  would you receive the second and third assignments?

21     A.   They would show up on the computer -- on the

22  software that Hobart has to assign you the work.  They

23  call it FSA.

24     Q.   FSA?

25     A.   Yes.

1     Q.    Okay.  So you get those subsequent assignments

2   the same way.  You get on the computer and look at your

3   email or the FSA system and it will have a -- you know,

4   another assignment?

5     A.    Right.

6     Q.    How does the -- these come from the dispatch?

7     A.    Yes.

8     Q.    Okay.  And how does dispatch know that you're

9   available for a second assignment or a third assignment?

10    A.    Well, typically we would -- let's say, I'm

11  going there for a two-hour call.  That's the typical

12  call length.

13    Q.    When you say you're going there for a

14  "two-hour call."

15    A.    Yeah.  For the most part, most of the service

16  calls are average two hours.

17    Q.    Okay.

18    A.    All right.

19    Q.    So is it fair to say that as you receive an

20  assignment and you go off to do the work, without

21  talking to anybody about the problem or whatever, you

22  know, the average call is a couple of hours?

23    A.    Yes.

24    Q.    Okay.  So you have that in mind.  All right.

25    A.    And if you feel like you're going to be there

Page 54

1          But you may respond.

2      THE WITNESS:   What do you mean?

3  BY MR. HILL:

4      Q.   Has anyone at Hobart ever told you that you

5  can't stop working on a scale, you know, for 30 minutes

6  to go take a meal break?

7      A.   When I first started with Hobart, I went to

8  Troy, Ohio for training.  And my understanding was, I'm

9  sitting in the classroom or working on project they have

10  us on and we broke for lunch.

11          And I had finished my assignment, but there

12  was another tech working on a similar problem on another

13  machine and he broke for lunch.  When we came back, the

14  instructor reamed him bad when he came back.  Why are

15  you eating lunch?  Who told you could go to lunch?  Is

16  the customer's equipment running yet?

17          And that's always -- that's the first

18  impression I got about lunches.

19      Q.   And that was in 1994?

20      A.   Yes.

21      Q.   Okay.  During some training session in Ohio?

22      A.   Yes.

23      Q.   And, you know, since that training session, in

24  1994 in Ohio, has Hobart communicated to you in any way

25  that its policy is that service technicians are required

1    to take off-duty meal breaks every workday?

2         MS. WORKMAN:  Objection.  Vague and ambiguous.

3            But you may respond.

4         THE WITNESS:  To -- yeah, I mean, in a meeting they

5    mention it.  But it wasn't, you will take a lunch.  It

6    wasn't nothing like that.

7    BY MR. HILL:

8         Q.   When you say "in a meeting they mentioned it,"

9    in what meeting was this mentioned?

10        A.   Well, different -- recently here in Ontario.

11   I mean, I know they brought it up then.

12        Q.   That wasn't the first time you heard that, was

13   it?

14        MS. WORKMAN:  Objection.  Vague and ambiguous.

15           But you may respond.

16        THE WITNESS:  San Bernardino, they may have

17   mentioned it.  I mean, just take your lunch, you know.

18   BY MR. HILL:

19        Q.   Have you ever been counseled for failing to

20   take your off-duty meal breaks?

21        A.   No.

22        Q.   Have you ever seen a written policy of

23   Hobart's requiring service technicians to take their

24   lunch breaks?

25        A.   No.  I mean -- just, they say -- I think the

1    policy book says they offer -- you have to take a break

2    a 30-minute -- you're entitled to a 30-minute meal

3    period.

4         Q.    Okay.  So you have seen that in the policy

5    manual, correct?

6         A.    Right.

7         Q.    Is it your testimony, sir, that you generally

8    are not able to take off-duty meal breaks?

9         MS. WORKMAN:  Objection.  Vague and ambiguous.

10         But you may respond.

11         THE WITNESS:  A full sit-down, 30-minute break, no.

12   BY MR. HILL:

13         Q.    You're not able to do that?

14         A.    Uh-huh.

15         Q.    Are you ever able to do that?

16         A.    Now I'm -- all of us make an effort to do it.

17         Q.    Well, to your knowledge, did other service

18   technicians not make an effort to do it before?

19         A.    Sometimes we didn't take a lunch.

20         Q.    How do you know what another service

21   technicians did?

22         A.    You're working with them.  There's two-man

23   jobs and we're working through it.  We're talking on the

24   phone.  So that's how I know.

25         Q.    Okay.  Are you now able to take a 30-minute

1    off-duty meal break?

2         MS. WORKMAN:  Objection.  Vague and ambiguous.

3              But you may respond.

4         THE WITNESS:  Yes, I -- I make it a point now.  I

5    mean, I -- everything has to wait now.  I take a lunch

6    when I can.

7    BY MR. HILL:

8         Q.   And are you generally able to now?

9         MS. WORKMAN:  Objection.  Vague and ambiguous.

10             But you may respond.

11        THE WITNESS:  Yes.

12   BY MR. HILL:

13        Q.   And what's changed between the situation now

14   and the situation that existed before?  What's changed

15   that enabled you to take an off-duty meal break now?

16        MS. WORKMAN:  Objection.  Vague and ambiguous.

17             But you may respond.

18        THE WITNESS:  It's just -- well, now I know I got

19   to take the break, you know.  And with the new policy,

20   you have to take it.

21   BY MR. HILL:

22        Q.   Okay.  So is -- what has changed is that it's

23   been impressed upon you by Hobart that you're required

24   to take an off-duty meal break?

25        MS. WORKMAN:  Objection.  Vague and ambiguous.

Page 58

1          But you can answer.

2      THE WITNESS:  Right.  As of June, when they came

3  out with their little new policy book, yes.

4  BY MR. HILL:

5      Q.   When -- before this change that you've

6  described, which apparently since the change has -- you

7  know, you taking your off-duty meal breaks, prior to

8  that change, when you did not consistently take off-duty

9  meal breaks, did you ever notify one of your supervisors

10 that you were unable to take a meal break?

11     A.   No.

12     Q.   The equipment that you're issued by Hobart in

13 connection with your duties and responsibilities, you

14 describe this Dell laptop computer.  Is there any other

15 equipment that you're issued?

16     A.   Some of your basic tools.  And I have two

17 laptops.  One communications laptop and one Dell laptop.

18     Q.   When you say a "communications laptop" --

19     A.   It's a computer that I use strictly for

20 repairing the communications, when there's problems with

21 the scales communicating -- sending prices and so forth.

22     Q.   Okay.

23     A.   For price updates every week.

24     Q.   Okay.  Any other equipment?  You mentioned a

25 cell phone.  It is it your personal cell phone?

Page 60

```
 1       A.   Yes.
 2       Q.   And why do you do that?
 3       A.   It's the way it's always been.  You know, it's
 4   service -- it's a service truck.
 5       Q.   Well, do you have the option of leaving the
 6   service van at the branch office?
 7       MS. WORKMAN:  Objection.  Vague and ambiguous.
 8            But you may respond.
 9       THE WITNESS:  You do, but it wouldn't make sense.
10   BY MR. HILL:
11       Q.   Why not?
12       A.   Because you're responsible for all the
13   equipment in that van.  There's no way to secure -- a
14   lot of us carry a lot of inventory as well as the tools.
15   You leave it in the shop, doesn't mean it's secure.
16   BY MR. HILL:
17       Q.   Is that why you take the service van home,
18   because your --
19       A.   No.  It's -- really, they don't have a place
20   for it, even if you did leave it.  There isn't room for
21   11 trucks in that shop.
22       Q.   Is there room for one truck?
23       A.   Probably.
24       Q.   So if you chose to leave your service van at
25   the branch office, there would be a place for it?
```

1      MS. WORKMAN:   Objection.   Incomplete hypothetical

2  and vague and ambiguous.

3          But you can respond.

4      THE WITNESS:   Yeah, there would be -- there would

5  be a parking spot there.

6  BY MR. HILL:

7      Q.   Okay.   And so again, why do you choose to take

8  the van home?

9      MS. WORKMAN:   Objection.   Asked and answered and

10  vague and ambiguous.

11          But you can respond again.

12      THE WITNESS:   It makes the responding to the work

13  calls a little bit -- it makes sense.

14  BY MR. HILL:

15      Q.   Makes sense?

16      A.   As far as service.

17      Q.   Is it more convenient for you to take the van

18  home?

19      MS. WORKMAN:   Objection.   Vague and ambiguous.

20          But you can answer.

21      THE WITNESS:   Right now, yes.

22      MR. HILL:   That's Number 1.

23  (Whereupon Exhibit 1 was marked for identification)

24  BY MR. HILL:

25      Q.   Okay.   Mr. Alcantar, a document's been placed

Page 61

1      MS. WORKMAN:  Objection.  Incomplete hypothetical

2   and vague and ambiguous.

3          But you can respond.

4      THE WITNESS:  Yeah, there would be -- there would

5   be a parking spot there.

6   BY MR. HILL:

7      Q.   Okay.  And so again, why do you choose to take

8   the van home?

9      MS. WORKMAN:  Objection.  Asked and answered and

10   vague and ambiguous.

11          But you can respond again.

12      THE WITNESS:  It makes the responding to the work

13   calls a little bit -- it makes sense.

14   BY MR. HILL:

15      Q.   Makes sense?

16      A.   As far as service.

17      Q.   Is it more convenient for you to take the van

18   home?

19      MS. WORKMAN:  Objection.  Vague and ambiguous.

20          But you can answer.

21      THE WITNESS:  Right now, yes.

22      MR. HILL:  That's Number 1.

23   (Whereupon Exhibit 1 was marked for identification)

24   BY MR. HILL:

25      Q.   Okay.  Mr. Alcantar, a document's been placed

1    in front of you that's been marked for purposes of

2    identification as Exhibit 1.  And it's a one-page

3    document with the heading Service Technician

4    Rules/Understandings.

5            And directing your attention to the bottom of

6    the exhibit, there's a place for a signature.  There's a

7    signature line and handwritten signature there.

8            Do you recognize that to be your signature?

9        A.   Yes.

10        Q.   And below that there is your handwritten

11   printed name.  Do you recognize that -- above the line

12   designated print name, do you recognize that printed

13   name to be in your handwriting?

14        A.   Yes.

15        Q.   And do you recall signing the original of this

16   document on or about March 17 of 1997?

17        A.   Vaguely, yeah.

18        Q.   Okay.  Do you recall reading the document at

19   the time you signed it?

20        A.   No, not totally.  No.

21        Q.   Is it generally your practice to read

22   documents before you sign them?

23        A.   Yes, it is.

24        Q.   Okay.  Directing your attention to Paragraph 8

25   of the Rules/Understanding document.  Paragraph 8 reads,

1    "I understand that I have the option of driving the

2    company vehicle to my home at the end of the workday and

3    from my home to my first work assignment of the day."

4           Do you see where I'm reading?

5    A.   Uh-huh, yes.

6    Q.   And has it been your understanding since

7    March 17, 1997 that you do, in fact, have the option to

8    leave the service van at the branch office at the end of

9    the workday?

10    MS. WORKMAN:  Objection.  Vague and ambiguous.

11           But you can answer.

12    THE WITNESS:  It's an option, but it doesn't make

13    sense.  It's there, but for service work it doesn't --

14    it won't work.

15    BY MR. HILL:

16    Q.   And again, why won't it work?

17    A.    Because there's no way to secure equipment.  I

18    mean, I'm responsible, what's in that van.  Nobody else.

19    I mean, I'm the one that's held accountable for the

20    inventory and the tools that are in there.

21    Q.   And that's the reason that you've elected to

22    take the van home?

23    A.    Right.

24    MS. WORKMAN:  Objection.  Vague and ambiguous.

25           You can answer.

Page 64

1       THE WITNESS:  Basically, yeah.  Because I'm

2   responsible for that equipment.

3   BY MR. HILL:

4       Q.   Any reason that you take the van home as

5   opposing to elect the option of leaving it at the branch

6   office, other than your concerns over your

7   responsibility for the equipment in the van?

8       MS. WORKMAN:  Objection.  Vague and ambiguous.

9           But you can answer.

10      THE WITNESS:  Ask that again, please.

11  BY MR. HILL:

12      Q.   Is there any reason why you have elected to

13  take -- why you elect to take the van home rather than

14  exercising the option that you have under this agreement

15  to leave the van at the branch office?

16          Any reason that you do that, take the van

17  home, other than your concerns over the security of the

18  equipment in the van.

19      MS. WORKMAN:  Same objection.  Vague and ambiguous.

20          But you can answer.

21      THE WITNESS:  Getting to the service call quicker.

22  If it's close to my home.

23  BY MR. HILL:

24      Q.   Okay.  You would agree though, that based on

25  this agreement, you're not required to take the van

Network Deposition Services, Inc. • networkdepo.com • 866-NET-DEPO

1        THE WITNESS:  Basically, yeah.  Because I'm

2   responsible for that equipment.

3   BY MR. HILL:

4        Q.   Any reason that you take the van home as

5   opposing to elect the option of leaving it at the branch

6   office, other than your concerns over your

7   responsibility for the equipment in the van?

8        MS. WORKMAN:  Objection.  Vague and ambiguous.

9             But you can answer.

10       THE WITNESS:  Ask that again, please.

11  BY MR. HILL:

12       Q.   Is there any reason why you have elected to

13  take -- why you elect to take the van home rather than

14  exercising the option that you have under this agreement

15  to leave the van at the branch office?

16            Any reason that you do that, take the van

17  home, other than your concerns over the security of the

18  equipment in the van.

19       MS. WORKMAN:  Same objection.  Vague and ambiguous.

20            But you can answer.

21       THE WITNESS:  Getting to the service call quicker.

22  If it's close to my home.

23  BY MR. HILL:

24       Q.   Okay.  You would agree though, that based on

25  this agreement, you're not required to take the van

Page 65

1  home, are you?

2      MS. WORKMAN:  Objection.  That calls for a legal

3  conclusion.

4          You may testify as to your understanding.

5      THE WITNESS:  From what I'm reading here, that's

6  what it says.

7  BY MR. HILL:

8      Q.  All right.  Thank you, sir.

9          Does Hobart impose any restricts on your

10  ability to use your service van for personal reasons?

11      A.  Yes.

12      Q.  And what are those restrictions?

13      A.  Basically, you can't use it for personal use.

14  You can't have riders in it.  If you do use it for

15  personal use, it has to -- you have to have approval

16  from the dispatcher or the branch manager.

17      Q.  Okay.  And how did you come by that

18  understanding?

19      A.  Somewhere in San Diego, "This is the way it

20  works, Joe.  If you're going to use the van for a

21  doctor's appointment or" -- it came up.  I don't

22  remember when -- exactly when, but.

23      Q.  Okay.  So it came up in connection with your

24  work in the San Diego branch office?

25      A.  Yes.

```
 1        Q.    And has it ever come up in connection with
 2    your work at any of the other branch offices?
 3        MS. WORKMAN:  Objection.  Vague and ambiguous.
 4        THE WITNESS:  No.  Because it's always -- you
 5    always call and say, Yeah, I'm using -- I got a doctor's
 6    appointment at 8:00.  Can I take the van?"
 7    BY MR. HILL:
 8        Q.    Okay.
 9        A.    And then you go to the appointment, you take
10    off from there to go to your service call.
11        Q.    Okay.  So you have -- I take it, you have
12    requested from your supervisor at times the ability to
13    use the van for personal reasons?
14        A.    Yes.
15        Q.    Have you ever been denied any such requests?
16        A.    I'm trying to remember.  I may have been --
17    Julie denied it one time, but I'm trying to remember
18    when.  I remember a "no" from her.
19        Q.    Well, let me ask you -- so there may have been
20    one time?
21        A.    Right.
22        Q.    Do you recall what personal purpose you wanted
23    to use the van for in that situation?
24        A.    It's always medical, for the most part.
25        Q.    Okay.  And setting aside that one time that
```

1   you're having some trouble recollecting, approximately

2   how many times have you asked to use the service van for

3   personal reasons?

4        A.   I'm going to say -- I'm going to say maybe

5   three times a year for a medical appointment or

6   something.

7        Q.   Okay.  And other than this one situation with

8   Ms. Evans that you can't recall specifically, have you

9   always been granted permission to use the service van

10  for those personal medical reasons?

11       A.   Yes.

12       Q.   You've never been disciplined for using your

13  service van for personal reasons, have you?

14       A.   No.

15       Q.   Are you aware of any service technician that's

16  been disciplined for using a service van for personal

17  reasons?

18       A.   There was one that got admonished in front of

19  all the other employees about doing it.

20       Q.   Who was that?

21       A.   That was Harry Ciubal.

22       Q.   How do you spell that?

23       A.   C-I-U-B-A-L.

24       Q.   And Mr. Ciubal was a service technician?

25       A.   Yes.

Page 72

1    BY MR. HILL:

2        Q.   Mr. Alcantar, a multipage document has been

3    placed in front of you that's been marked for purposes

4    of identification as Exhibit 3.

5             I will represent to you that this is a copy of

6    the Second Amended Complaint that was filed on your

7    behalf in this case, and which is the current operative

8    Complaint in the case.

9             Have you ever seen that pleading before?

10       A.   I had seen something similar, I believe, on an

11   email.

12       Q.   Okay.  Do you have a recollection of seeing --

13   do you have a specific recollection of seeing the Second

14   Amended Complaint that's before you as Exhibit 3?

15       A.   The entire thing, no.

16       Q.   Okay.  Do you recall -- do you have a

17   recollection of ever having read that entire Complaint?

18       A.   No.

19       Q.   Can you tell me the claims that have been

20   asserted, the claims for relief that have been asserted

21   on your behalf in this case?

22       MS. WORKMAN:   Object to the extent it calls for

23   attorney/client privilege communications between my

24   office and you.

25             But can you give him your general

1    understanding.

2         THE WITNESS:  Basically, I guess I'm suing for

3    compensation on missed lunches and missed overtime or

4    travel that I should have been compensated for.

5    BY MR. HILL:

6         Q.   Okay.  When you refer to missed overtime or

7    missed travel time, are you referring to the same thing?

8         A.   Yeah.  Yes.

9         Q.   Okay.  Is it your belief that you are owed

10   overtime compensation for travel time that you've not

11   been paid for?

12        A.   Yes.

13        Q.   Okay.  And is that related to your commuting

14   time?

15        A.   Yes.

16        Q.   Okay.  Does it relate to anything other than

17   commuting time?

18        A.   On some of the service work, yes.

19        Q.   Okay.  And when you say "on some of the

20   service work, yes," what do you mean?  I don't

21   understand.

22        A.   Sometimes they don't pay you overtime, even

23   though they give you an overtime call.

24        Q.   Okay.  Can you describe for me a situation

25   like that?  I still don't understand.  You don't --

Network Deposition Services, Inc. • networkdepo.com • 866-NET-DEPO

Page 76

1   And I -- I'm sorry that I interrupted your flow, because

2   sometimes.

3   BY MR. HILL:

4       Q.   Other than the commuting time that you feel

5   you should be paid for that you're not getting paid for,

6   and this other situation that you've described when you

7   pick up an assignment that -- you know, at the end of

8   the day that puts you into an overtime situation, but

9   where you're not compensated for all of the travel time

10  from that last overtime assignment until you get home,

11  is there any other situation where you believe you work

12  overtime and aren't being compensated for it?

13      A.   Well, no, you covered it.

14      Q.   Do you know what the regular rate is?

15      MS. WORKMAN:   Objection.   That's vague and

16  ambiguous.

17      THE WITNESS:   For regular rate -- for my regular

18  rate or overtime rate or what are we talking about?

19  BY MR. HILL:

20      Q.   Do you know what the regular rate is as it

21  relates to overtime?   Does it have any meaning to you,

22  that term?

23      A.   Time and a half is overtime.

24      Q.   Okay.   So the regular -- so you're

25  understanding of the regular rate is that it's time and

```
 1    a half for overtime?

 2         A.   Yes.

 3         Q.   All right.  Do you know how the regular rate

 4    is calculated?

 5         A.   Well, anything -- well, anything -- they say

 6    anything over the 40 hours is -- the new policy book, is

 7    what they did.

 8         Q.   Okay.  Beyond that testimony, do you have any

 9    understanding as to how the regular rate is calculated?

10         MS. WORKMAN:  Objection.  Vague and ambiguous.

11              But you can answer.

12         THE WITNESS:  Basically, anything over 40 was

13    over -- is overtime.  If it's anything past 12 hours in

14    a day, it's double time.

15    BY MR. HILL:

16         Q.   Okay.  Do you have any reason to believe that

17    Hobart has calculated your regular rate incorrectly?

18         MS. WORKMAN:  Objection.  To the extent it calls

19    for a legal conclusion.

20              But you may respond as to your understanding.

21         THE WITNESS:  Yes, this is why we're here.

22    BY MR. HILL:

23         Q.   Okay.  So why do you believe -- I understand

24    that you believe you haven't been compensated for all

25    the overtime you've worked.
```

1            My question is:  Do you have any reason to

2    believe that when your overtime -- when you've been paid

3    for the overtime that you worked, that overtime has been

4    calculated incorrectly?

5        A.   Yes.

6        Q.   Why's that?

7        A.   Well, you saw that one write-up that

8    mentioned.

9        Q.   Yes.

10       A.   And she would take time away from my -- she

11   would always mess with my timesheet.  She'd adjust it.

12       Q.   Okay.  Correct.

13       A.   But they would never tell you why.  It would

14   send you an email, "I adjusted this," but they would

15   never say -- or Julie would never say, "This is why.

16   I'm showing this."  Or it never -- never happened.

17       Q.   Mr. Alcantar, is it your testimony that nobody

18   at Hobart explained to you why they thought you had

19   under -- underreported overtime or over reported

20   overtime, that that never happened?

21       MS. WORKMAN:  Objection.  Argumentative and it may

22   be vague and ambiguous.

23            But you can answer.

24       THE WITNESS:  It happened, but it never -- it was

25   vague.  It was never how I would explain it.

Page 81

1    your pay via direct deposit or do you receive a paper

2    paycheck?

3        A.    Direct deposit.

4        Q.    And when you receive -- when you receive your

5    pay by direct deposit, does Hobart provide you any sort

6    of documentation for the pay?

7        A.    Yeah, the pay statement.

8        Q.    Okay.  And does that pay statement include

9    information regarding your hours worked and your pay

10   rates?

11       A.    Yes.

12       Q.    Okay.  I think earlier in your testimony you

13   testified that when you receive an award or a SPIF, that

14   that's reflected on paystub as well?

15       A.    Correct.

16       Q.    Do you generally review those pay statements

17   when you receive them?

18       A.    No.  I mean, I put them in a drawer in case I

19   need to reference them.

20       Q.    Okay.

21       A.    But for the most part, you can see how much is

22   getting deposited.

23       Q.    You've maintained copies of them?

24       A.    For the most part.

25       Q.    How far back do you have copies of your pay

Page 82

1    statements?

2         A.   I'd have to look.  I can't say exact date.

3         Q.   Last year?

4         A.   Probably there.

5         Q.   Okay.  Have you ever had any reason to believe

6    that your pay statements were inaccurate?

7         MS. WORKMAN:  Object to the extent it calls for a

8    legal conclusion regarding the accuracy of the pay

9    statements.

10            But you can respond as to your understanding.

11        THE WITNESS:  Basically, even if the pay was wrong,

12   I mean, you're looking at it.  There's no -- there's no

13   arguing what the manager puts on the timesheet.  If they

14   take off hours, they take off hours.  If they add one,

15   they add.

16   BY MR. HILL:

17        Q.   Have you ever complained to anyone at Hobart

18   that one of your wage statements or pay statements was

19   inaccurate?

20        A.   No.

21        Q.   Have you ever reviewed the pay statement of

22   any other service technician at Hobart?

23        A.   I answered that earlier, no.

24        Q.   Okay.  It's good somebody is paying attention.

25        MR. HILL:  Okay.  Let's take a break.

Page 95

1                    PENALTY OF PERJURY CERTIFICATE

2

3        I hereby declare I am the witness in the within

4    matter, that I have read the foregoing transcript and

5    know the contents thereof; that I declare that the same

6    is true to my knowledge, except as to the matters which

7    are therein stated upon my information or belief, and as

8    to those matters, I believe them to be true.

9        I declare being aware of the penalties of perjury,

10   that the foregoing answers are true and correct.

11

12

13

14

15      Executed on the _____ day of _____, ____,

16   at _____, _____.

17             (CITY)                    (STATE)

18

19

20

21      _____

22             JOSE LUIS ALCANTAR

23

24

25

Page 96

```
1   STATE OF CALIFORNIA          )
                                 ) ss:
2   COUNTY OF ORANGE             )

3

4            I, LINDA D. WHITE, do hereby certify:

5       That I am a duly qualified Certified Shorthand

6   Reporter, in and for the State of California, holder of

7   certificate number 12009, which is in full force and

8   effect and that I am authorized to administer oaths and

9   affirmations;

10           That the foregoing deposition testimony of the

11  herein named witness was taken before me at the time and

12  place herein set forth;

13           That prior to being examined, the witness named

14  in the foregoing deposition, was duly sworn or affirmed

15  by me, to testify the truth, the whole truth, and

16  nothing but the truth;

17           That the testimony of the witness and all

18  objections made at the time of the examination were

19  recorded stenographically by me, and were thereafter

20  transcribed under my direction and supervision;

21           That the foregoing pages contain a full, true

22  and accurate record of the proceedings and testimony to

23  the best of my skill and ability;

24           That prior to the completion of the foregoing

25  deposition, review of the transcript was not requested.
```

Network Deposition Services, Inc. • networkdepo.com • 866-NET-DEPO

1-51

1    I further certify that I am not a relative or

2  employee or attorney or counsel of any of the parties,

3  nor am I a relative or employee of such attorney or

4  counsel, nor am I financially interested in the outcome

5  of this action.

6

7    IN WITNESS WHEREOF, I have subscribed my name

8  this ____ day of _____, ____.

9

10

11    _____

12    LINDA D. WHITE, CSR No. 12009

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

# SERVICE TECHNICIAN
# RULES/UNDERSTANDINGS

## Tools/Service Manuals/Credit Card Responsibility

The tools furnished me by the company have been delivered to me for my use as a service technician. I have examined the list and receipt of the tools which have been furnished to me. I agree that the list is correct. I have signed a receipt for those tools. I assume full responsibility for those tools as well as any service manuals and will use them, maintain them and care for them in such a manner that they will be useful for the normal life of such tools and/or manuals.

Any tools broken during the course of normal usage will be repaired or replaced at the company's expense. It is my responsibility to turn in any broken tools to my supervisor and obtain a receipt for such tools from my supervisor. If any broken tool is not turned in, I will be personally responsible for the replacement cost of that tool.

Should any of the tools be lost, misplaced or should they not be available when regularly inventoried, or returned by me at the request of the company, then I accept full responsibility for such tools, and agree to pay for such tools.

I understand that any credit cards issued to me are to be used only for the operation and maintenance of the company vehicle issued to me and I must surrender them upon termination.

## Service Vehicles

The following is a reaffirmation of the company's position regarding the use of company service vehicles.

1. Anyone operating a company vehicle must maintain a valid operator's license applicable to the state in which the operator resides. If for any reason the operator's license is suspended or revoked, management must be notified within 24 hours. If a state in which the company vehicle is operated requires an additional license from that issued in the state in which the operator resides, it shall be the responsibility of the operator to obtain such additional license.

2. The operator shall neither operate the vehicle while under the influence of alcohol, drugs or any other controlled substance, nor transport or store alcohol, drugs, or other controlled substances in the vehicle. If an operator is using a prescribed medication under a doctor's care which can influence his/her ability to operate a vehicle, management must be notified within 24 hours.

3. The operator of a company service vehicle must always remember the vehicle represents your facility, the company and you as an employee. They must operate the vehicle lawfully and courteously at all times. Any accident, no matter how minor, must be reported to management immediately. (Refer to Form F-5 Vehicle Safety and Driver Qualification Policy Manual—with vehicle.)

4. It is understood by me that the service vehicle I am assigned will very likely be used for commuting between home and office/work site and return. I will exercise reasonable security while the service vehicle is parked at my residence.

5. Personal use of the service vehicle, other than commuting from home to the first work assignment and from the last work assignment to home, is strictly prohibited unless prior written approval is granted by management. (An example of personal use for which prior approval could be granted would be in case of a dental appointment which cannot be scheduled after hours or on a weekend.)

6. No passengers are permitted in the service vehicle unless approval is received in advance from management.

7. I understand that the service vehicle is company property and may be inspected by management or a management representative at any time without prior notice to me.

8. I understand that I have the option of driving the company vehicle to my home at the end of the work day and from my home to my first work assignment of the day. I also understand I may park the company vehicle at the office to which I am assigned.

   a) If I choose to use the company vehicle to travel to and from my home to work, I understand that I will not be paid for the travel time to my first assignment and from my last assignment to my home on regular work days, unless such travel is beyond the normal commuting area.

   b) If I choose to start and end my work day at the office where the company vehicle is garaged, I understand I am responsible for being on the way to my first assignment in the company vehicle at the beginning of the work day as designated by my supervisor.

The term "management" as used in the above policy means the Manager of a Branch, or a Manager, Director or Vice President, whichever is applicable, of any other operating unit of the company.

I have read and fully understand the rules set forth by the company for both the use and care of the company service vehicle, the company service tools and manuals and company credit cards. I also understand any infraction of these rules will result in disciplinary action up to and including termination.

_____
Signature

_Jose luis V Alcantar_
(Print name)

_3-17-97_
Date

_____
Manager's Signature

EXHIBIT
_1_
_Alcantar_

# EXHIBIT 3

Page 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---o0o---

JOSELUIS ALCANTAR, on behalf of )
himself and all others )
similarly situated, )
)
            Plaintiff,      )    Case No. ED
)                CV11-01600 PSG
        vs.                 )    SP
)
HOBART SERVICE, a division of )
ITW FOOD EQUIPMENT GROUP, LLC, )
ITW FOOD EQUIPMENT GROUP, LLC, )
a Delaware limited liability )
corporation, and Does 1 through )
100, inclusive, )
)
            Defendants.     )
_____)

DEPOSITION OF MICHAEL JEWETT

THURSDAY, AUGUST 2, 2012

REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

3-1

Page 11

```
        1   which is her transcript of what has happened today,

        2   and you have an opportunity to make changes to that

        3   transcript.

        4           Now, you can make any change you want,

10:57   5   that's your right, but I want to let you know up

        6   front if you change something like yes to no, black

        7   to white, the light was green to red, that is

        8   something that lawyers can comment on at some later

        9   point in time that may impact your credibility.

10:57  10       A.   Okay.

       11       Q.   Do you understand?

       12       A.   Yes.

       13       Q.   Because of that reason and many others, if

       14   you want to make any change, modification,

10:57  15   addition, subtraction to any testimony at any time,

       16   you let me know, okay?

       17       A.   Okay.

       18       Q.   Are you currently employed, sir?

       19       A.   Yes.

10:57  20       Q.   With whom?

       21       A.   Hobart ITW.

       22       Q.   What is your current position?

       23       A.   Regional director.

       24       Q.   How long have you held that position?

10:57  25       A.   Approximately ten years.
```

Page 12

1    Q.   Okay.  When you say you are a regional

2  director, what region?

3    A.   I am responsible for the Central West

4  region and the Southern California region.

10:58  5    Q.   Are you responsible for the entirety of

6  California in whatever you describe your regional

7  responsibilities to be?

8    A.   No.

9    Q.   So just the southern part of California?

10:58 10    A.   Correct.

11    Q.   All right.  And can you give me a rough

12  geographic demarcation where that southern part of

13  California would begin?

14    A.   Fresno, Bakersfield, south.

10:58 15    Q.   Are there Northern California Hobart

16  locations for where you are not responsible?

17    A.   Yes.

18    Q.   How many?

19    A.   I believe two.

10:58 20    Q.   Okay.  What are those locations?

21    A.   Sacramento and Bay Area.

22    Q.   Is there a regional director who is

23  responsible for those?

24    A.   Yes.

10:59 25    Q.   Who?

Page 13

1    A.    Jim Banis, B-a-n-i-s.

2    Q.    N as in Nolan, correct?

3    A.    Correct.

4    Q.    To your knowledge, are there any -- strike

10:59  5    that.  I'll get to that later.

6          What are your duties as the regional

7    director?

8    A.    In a general sense, I am responsible for

9    supervision of approximately 40 service offices.

11:00 10    Q.    Do your duties include, for example, the

11    drafting of meal and rest period policies for, say,

12    the hourly employees in California?

13    A.    No.

14    Q.    What responsibilities, if any, do you have

11:00 15    with respect to the creation or formulation of meal

16    period policies for hourly employees in California?

17    A.    Can you repeat it?

18    Q.    I'm sorry.  That was a long, bad question.

19          Do you have any responsibilities for the

11:00 20    creation of meal period policies for hourly

21    employees in California?

22    A.    Can you please define "creation"?

23    Q.    Do you write them?

24    A.    No, I do not.

11:00 25    Q.    Do you review meal period policies for the

Page 19

1        to your current position?

2            A.   Yes.

3            Q.   What?  Let's go back in time.

4                 MR. HILL:  Back in time from when?

11:07 5           MS. WORKMAN:  That's probably a good

6        instruction.

7            Q.   So let me ask you a more lawyer-like

8        question.

9                 Prior to the time you held the regional

11:07 10 director position, what position did you hold at

11       Hobart?

12                And I want you to go back in time starting

13       with your regional director position, the position

14       immediately preceding that, and then if there are

11:08 15 any other positions, those positions in that

16       descending order, okay?

17           A.   Okay.  Prior to my role as regional

18       director, I was a branch manager for approximately

19       seven years in our Buena Park facility.

11:08 20               Prior to that I was an assistant branch

21       manager for roughly nine months.  Prior to that I'd

22       held several entry-level roles.

23           Q.   Where were you assistant manager?

24           A.   Garden Grove, California.

11:08 25     Q.   Did you ever hold a service technician

Page 21

1        Q.   Right.  So they got their technical

2    training when they went to wherever they go to get

3    their training at Hobart, correct?

4        A.   Correct.

11:10  5        Q.   But you would train them on customer

6    service aspects of their job?

7        A.   Correct.

8        Q.   What, if any, responsibilities did you

9    have as the branch manager with respect to

11:10 10   informing or apprising the service technicians of

11   Hobart's general policies and procedures?

12       A.   I want to make sure I understand the

13   question.  So if I restate it, you're asking me

14   what was my role in communicating policies?

11:10 15       Q.   That's one component.  Did you have a

16   responsibility to communicate Hobart's policies and

17   procedures to the service technicians when you were

18   the branch manager at Buena Park?

19       A.   Yes.

11:10 20       Q.   Explain to me what you would do in that

21   regard?

22       A.   Well, the policies and procedures were

23   reviewed with an employee upon hire using our

24   policy and procedure manual.

11:11 25            During the course of their onboarding,

Page 23

1    to meal periods?

2         A.    Yes.

3         Q.    So you're conveying to me that on this

4    form, there is a box that says something about meal

11:12 5    periods?

6         A.    Yes.

7         Q.    What does it say?

8         A.    To my recollection, it says "lunch hour"

9    or "lunch period."

11:13 10        Q.    Is that the only reference?  Any other

11   writing or explanation by this particular

12   indication with respect to lunch or meal period?

13        A.    On the new employee orientation checklist,

14   I believe there is just one bullet for that.

11:13 15        Q.    When you say "new employee orientation

16   checklist," that implies to me that at some point

17   in time a new form was used at Hobart.

18              Is that what you're intending to convey?

19        A.    No.

11:13 20        Q.    Okay.

21        A.    When I say "new employee," I mean new

22   employee.

23        Q.    I see.  I understood that in the wrong

24   manner.

11:13 25              And what, if any, information did you

Page 24

1    convey to the service technicians with respect to
2    the lunch or meal period when going over this new
3    employee checklist with them?
4        A.    Lunch is a 30-minute period that is
11:14 5  typically taken during the first five hours of a
6    shift.  It is not a set time established each and
7    every day, but there is indeed a provision for a
8    lunch period.
9        Q.    To your knowledge -- strike that.
11:14 10           When you were branch manager, did you
11   receive any training with respect to what to convey
12   to your employees, your hourly employees, with
13   respect to meal periods?
14       A.    I don't recall any formal training.
11:14 15 However, the checklists were reviewed and we had to
16   make sure we understood them in order to be able to
17   effectively communicate them.
18       Q.    With respect to -- when you say no formal
19   training, was there anything else in writing that
11:15 20 you received as a branch manager with respect to
21   what you were supposed to do or convey to your
22   hourly employees in California regarding their
23   entitlement to a meal period?
24       A.    None that I recall.
11:15 25     Q.    In your tenure as a branch manager, did

Page 32

1  A. For the record, it is not handwritten, it

2 is a typed PowerPoint presentation, but I am fairly

3 confident I have a copy of it.

4  Q. That's fair.  I doubt it was handwritten

11:25 5 in pencil.  I understand that.  Poor question on my

6 part.

7  What, if anything, did Dawn convey on the

8 webinar regarding Hobart's policies with respect to

9 compensating the hourly service technicians with

11:26 10 respect to their drive time?

11  A. Just reinforcement of our policy to not

12 pay for normal commute time, to not -- that we

13 don't pay travel to the technicians should they

14 choose to drive their own vehicle to the office and

11:26 15 leave their van at the office back and forth each

16 day.

17  That we do pay for commute time outside of

18 normal commute.  We do pay for travel time relative

19 to any after-hours work that they perform, and that

11:26 20 we do pay for the time -- their travel time during

21 their normal shift.

22  Q. When you use the term "normal commute

23 time," what do you understand that to mean?

24  A. Normal commute time is individual subject

11:27 25 to the residence of the technician and their

Page 33

1    proximity to the branch office that they are

2    assigned.

3        Q.   Does that mean the amount of time it takes

4    the technician to drive from their home to the

11:27 5    branch to which they were assigned?

6        A.   I'm sorry, can you repeat?

7        Q.   Sure.  Is what you're conveying to me that

8    the normal commute time for each technician is the

9    amount of time that it would take them to drive

11:27 10    from their normal residence to the branch to which

11    they are assigned by Hobart?

12        A.   That would indeed be their normal commute

13    time.

14        Q.   Has that been -- strike that.

11:27 15        Has it been Hobart's policy since 2007 to

16    the present that it does not compensate the service

17    technicians for what it describes or believes to be

18    the normal commute time, as you've used that term?

19        A.   Sorry.  Can you repeat?

11:28 20        Q.   Sure.  To your knowledge, has it been

21    Hobart's policy from 2007 to the present not to

22    compensate the service technicians for the normal

23    commute time, as you've described that term?

24        A.   Yes.

11:28 25        Q.   Okay.  To your knowledge, has that policy

3-10

Page 34

1    changed in any way from 2007 to the present?

2        A.    Not that I'm aware of.

3        Q.    When Dawn was giving this PowerPoint

4    presentation that you watched, did she indicate in

11:28 5    any way that Hobart's policies with respect to the

6    compensation of service technicians for the time

7    they spent driving the vehicles had changed in any

8    way?

9        A.    No.

11:29 10        Q.    In this PowerPoint presentation, was the

11    topic of the service technicians' personal use of

12    the service vehicle covered?

13        A.    Yes.

14        Q.    What was discussed in that regard?

11:29 15        A.    That the definition of "personal use" that

16    we have been using, where we do allow reasonable

17    and customary personal use, such as stopping for a

18    cup of coffee on the way in or a donut or stopping

19    for a gallon of milk on the way home was going to

11:29 20    be broadened.

21            So we have permitted those and now we were

22    expanding to allow more personal use beyond what

23    would be considered just the normal day to day.

24        Q.    When you say "the definition of personal

11:30 25    use that we had been using, where we do allow

3-11

Page 35

```
          1   reasonable and customary personal use, such as

          2   stopping for a cup of coffee or getting a donut or

          3   a gallon of milk," is it your testimony that

          4   Hobart, from 2007 until June of 2012, had allowed

11:30     5   the service technicians to use the service vehicles

          6   for personal use?

          7        A.   Personal use as defined by cup of coffee,

          8   yes.  Personal use beyond what would be considered

          9   normal and customary was also permissible with

11:30    10   written consent or approval from a manager.

         11        Q.   To your knowledge, was there any document

         12   that stated that Hobart allowed these service

         13   technicians to use their service vehicles for their

         14   personal use ever provided to the service

11:31    15   technicians?

         16        A.   Yes.

         17        Q.   When?

         18        A.   Upon hire.

         19        Q.   What document?

11:31    20        A.   Form F-1188.

         21        Q.   I haven't seen Form F-1188.  So describe

         22   for me Form F-1188.

         23        A.   It is a service technician rules and

         24   understanding.  There's an item on there regarding

11:31    25   personal use.
```

3-12

Page 43

```
 1    dental appointment, for example, which cannot be
 2    scheduled after hours or on a weekend.
 3          People typically would drink coffee on
 4    their commute.  So to think that that's something
11:42 5    somebody couldn't do except for after hours or on
 6    the weekend isn't reasonable.
 7    Q.   Any other example for what people could
 8    use the service vehicle for other than getting a
 9    cup of coffee?  When you say personal use that was
11:42 10   allowed, other than this getting a cup of coffee
 11   issue that you have mentioned a couple times?
 12          MR. HILL:  That's not what he said.  He
 13   said personal use that is allowed.  He said there
 14   are certain types of activities that don't fall
11:42 15   within the definition of personal use.
 16          MS. WORKMAN:  Let me give you a better
 17   question.
 18   Q.   Any other type of activity that the
 19   service technicians are allowed to use these
11:42 20   service vehicles that is not Hobart-related that
 21   does not fall within the definition of personal use
 22   other than getting a cup of coffee, which you've
 23   described for me?
 24   A.   Yes, reasonable and customary use is
11:43 25   permissible.  Cup of coffee was simply an example.
```

Page 44

1   A cup of coffee, a donut, driving through to grab

2   something to eat, grabbing a pack of cigarettes if

3   an employee smokes, grabbing a gallon of milk.

4         As long as the employee is not going out

11:43  5   of their way, it would not be considered personal

6   use.

7    Q.   Is there any document which outlines this

8   reasonable and customary use idea which you have

9   just described for us on the record?

11:43 10    A.   Not that I'm aware of.

11    Q.   So in your 20-plus -- well, just your 20

12   years at Hobart, almost 20, you haven't seen a

13   document which explains this reasonable and

14   customary use of the vehicle by the service

11:43 15  technicians, correct?

16    A.   I do not recall one.

17    Q.   Okay.  Let's mark this next in order.

18        (Reporter marked Exhibit No. 2 for

19        identification.)

11:44 20    Q.   BY MS. WORKMAN:  Sir, the court reporter

21   has handed you a two-page document which is Bates

22   labeled HS 00061 through 62, which is a memo from

23   Julie Evans-Hanna, H-a-n-n-a, to many people, one

24   of whom includes you on the carbon copy.

11:44 25        Do you see this document?

Page 66

1          technicians in California between

2          October 5th, 2007, and the present."

3          Do you see that?

4     A.   I see it.

12:22  5     Q.   In connection with this lawsuit, did you

6     look for any documents responsive to this request?

7     A.   No.

8     Q.   Okay.  Request 15 asks for you to --

9     strike that.

12:22 10          Request 15 asks for:

11              "All documents regarding, explaining,

12              outlining or pertaining to the normal

13              commuting area for California

14              employees from October 5th, 2007, to

12:22 15              the present."

16          Do you see that?

17     A.   I do.

18     Q.   Did you look for any documents responsive

19     to this request?

12:22 20     A.   No.

21     Q.   Now, how does -- since 2007, how does

22     Hobart determine the normal commuting area for the

23     service technicians?

24     A.   Normal commute time is typically

12:23 25     established between the technician and their branch

3-15

Page 67

1    manager in a collaborative fashion, where they

2    identify where a technician lives and the proximity

3    to the branch office.

4         The two will typically work together to

12:23 5    identify what a normal commute time is and often,

6    if not always, possibly, GPS records can also be

7    used to verify and validate.

8    Q.   Hobart since 2007 has had GPS on the

9    service vehicles used by California technicians,

12:23 10   correct?

11        Let me give you a better question.

12        Do you know what date Hobart started using

13   the GPS system on its service vehicles in

14   California?

12:23 15   A.   I do not know the specific date.

16   Q.   Do you know what year?

17   A.   I would guess --

18   Q.   Is that a best estimate?

19   A.   Best estimate, 2005, possibly.

12:24 20   Q.   Is it accurate to state that the

21   service -- strike that.

22        Is it accurate to state that the branch

23   managers use the GPS records to establish the

24   normal commute time for the service technicians in

12:24 25   California?

3-16

Page 70

1    look for any documents responsive to this request?

2        A.    I did not.

3        Q.    Did you look for any documents responsive

4    to any of the requests that are attached to Exhibit

12:26  5   3 in connection with this lawsuit?

6              And the document requests, just to help

7    you out, start on Page 8.

8        A.    In order to answer the question, I need to

9    review all of them.

12:27 10   Q.    Go ahead, sir.  I thought this might be an

11   easier way to answer all those questions.  Whenever

12   I try to be easier, it takes longer.

13       A.    I can summarize.  I did not look for any

14   documents of any nature for this suit.

12:27 15   Q.    That is fine.  That is a perfect

16   summarization.

17              (Reporter marked Exhibit No. 7 for

18              identification.)

19       Q.    BY MS. WORKMAN:  All right.  The court

12:28 20   reporter has handed you what she has marked as

21   Exhibit 7.  It is a multipage document Bates

22   labeled JA 000385 through JA 000404.

23              The front page of the document reflects

24   that it is "Personnel Policies and Procedures,

12:29 25   Field Operations, Nonexempt Employees."

```
          1              Do you have Exhibit 7 in front of you?

          2        A.   I do.

          3        Q.   Have you seen this document before?

          4        A.   I have.

12:29     5        Q.   What do you understand it to be?

          6        A.   As stated, personnel policies and

          7   procedures.

          8        Q.   For Hobart?

          9        A.   Correct.

12:29    10        Q.   From 2007 to the present, were service

         11   technicians in California provided this document?

         12        A.   To the best of my knowledge, yes.

         13        Q.   Okay.  Is this the personal policies and

         14   procedures that has been in place for that time

12:29    15   period, 2007 to the present?

         16        A.   I believe so.

         17        Q.   Okay.  Let's take a look in here.

         18             Go to page -- the Bates label is probably

         19   easier, 391.

12:30    20        A.   Okay.

         21        Q.   On the right-hand side there's a section

         22   titled:  "Lunch Period."

         23             Do you see that?

         24        A.   I do.

12:30    25        Q.   The section reads:
```

Page 72

```
 1              "The exact time for your lunch will
 2              vary depending on your location and
 3              the needs of the customer.  All
 4              employees are required to take a lunch
12:30 5         break.  See your manager or dispatcher
 6              on scheduling an appropriate time for
 7              lunch."
 8         Do you see that?
 9    A.   I do.
12:31 10   Q.   Is that an accurate statement of Hobart's
11  policy with respect to a lunch period from 2007 to
12  the present?
13    A.   Yes.
14    Q.   To your knowledge, are the service
12:31 15  technicians in California provided any documents
16  that state that they are entitled to a 30-minute
17  lunch period?
18    A.   No documentation that I am aware of.
19    Q.   To your knowledge, are the technicians
12:31 20  provided any documents that tell them that they are
21  entitled to an uninterrupted lunch period?
22    A.   No documents that I am aware of.
23    Q.   To your knowledge, are the technicians
24  provided any documents which tell them when they
12:31 25  are entitled to a lunch period?  By that, I mean at
```

3-19

1   the five-hour mark in the day?

2       A.   No documentation to specify what time

3   lunch is taken.

4       Q.   To your knowledge, are the service

12:32  5   technicians in California provided any documents

6   whatsoever that tell them when they are required to

7   take their lunch period?

8       A.   None to my knowledge.

9       Q.   Now, it indicates -- sorry, Exhibit 7,

12:32 10   indicates:

11           "See your manager or dispatcher on

12            scheduling an appropriate time for

13            lunch."

14       When you were the branch manager, did you

12:32 15   schedule the service technicians' lunch periods?

16       A.   No.

17       Q.   And to your knowledge, from 2007 to the

18   present, who scheduled service technicians' lunch

19   periods in California?

12:32 20       A.   Typically, on a daily basis, the

21   dispatcher.

22       Q.   How does the dispatcher schedule the

23   service technicians' meal periods in California?

24       A.   I don't know that it is a specific

12:33 25   schedule as much as it is just a general reciprocal

1    understanding that a meal period is provided within

2    the first five hours of the day.

3            Due to the nature of our business as a

4    service organization, a technician may not want to

12:33  5    interrupt the service call he or she is performing.

6    So they'll typically wait until they finish their

7    job and eat their lunch.

8            Oftentimes the technician will initiate it

9    and oftentimes the dispatcher will initiate it.

12:33 10    Q.    "Initiate it," you mean the lunch?

11    A.    Yes, the lunch.

12    Q.    Does Hobart take any action to make sure

13    that the service technicians are actually relieved

14    for their lunch period?

12:34 15    A.    By "action" you mean what?

16    Q.    Anything.

17    A.    I am not aware of anybody not getting the

18    opportunity to take lunch in all my years.

19    Q.    Are you aware of any action taken by

12:34 20    Hobart to make sure that the service technicians

21    are actually relieved of all duty for a 30-minute

22    lunch break at five hours during the day?

23    A.    I am not aware of anything.  And

24    conversely, I don't know that taking lunch is ever

12:34 25    an issue.

1       Q.   Now, is it accurate to state that if the

2   service technicians are on their lunch break and

3   someone from Hobart calls them, they are instructed

4   or expected to answer the telephone call?

12:37 5      A.   I don't believe that to be the case.

6       Q.   Did you ever convey -- strike that.

7            To your knowledge, did Hobart ever convey

8   to service technicians that they did not have to

9   answer telephone calls from Hobart when they were

12:38 10   on their meal breaks?

11      A.   I have no remembering or recollection of

12   technicians being told to or not to answer the

13   phone during their meal break.

14      Q.   So to your knowledge, was that discussed

12:38 15   at all, the issue as to what the service

16   technicians had to do in response to the employer

17   calling them or trying to contact them during their

18   meal break?

19      A.   I don't believe there's any expectation

12:38 20   that a technician should answer his or her cell

21   phone during their meal time.

22      Q.   To your knowledge, are there any documents

23   that convey to the service technicians that there

24   was or was not an expectation that they respond to

12:38 25   phone calls from the employer during their meal

Page 80

```
          1              personal use."

          2              Do you see that?

          3         A.   I see it.

          4         Q.   So is it your understanding that the
12:42     5    operation of a service vehicle for personal use by

          6    a service technician may lead to discipline, up to

          7    and including termination?

          8         A.   It may, subject to the personal use.

          9         Q.   What do you mean, "subject to the personal
12:42    10    use"?

         11         A.   In accordance with the rules and

         12    understanding, when I discussed the example of a

         13    baseball game or dentist appointment in contrast to

         14    reasonable personal use, such as stopping for
12:42    15    coffee, something to eat, very simple things that

         16    are not disruptive, things that are not out of the

         17    way, those would not qualify in my definition nor

         18    the expectation and application to our employees as

         19    personal use.
12:43    20              Personal use in regard -- as defined here

         21    in the letters themselves would make "personal use"

         22    a very broad statement.  I am qualifying personal

         23    use as personal use such as a baseball game versus

         24    normal, customary commuting-type behavior.
12:43    25         Q.   Other than Exhibit 1, which is the service
```

3-23

Page 119

    1        A.    I do not.   I believe there were three
    2   bullets, and the one that stands out was the
    3   expanded definition of personal use.
    4        Q.    Did you understand that this PowerPoint
02:43  5   presentation was an expansion of the personal use
    6   policy that Hobart had had in the past?
    7        A.    The communication was to further expand
    8   the definition of personal use, as to not have
    9   anybody think stopping for coffee would be
02:44 10   considered personal use.
   11        Q.    Are you -- are you familiar with how
   12   Hobart calculates the regular rate of pay for its
   13   California hourly employees?
   14        A.    I am not a payroll expert, but I have a
02:45 15   general understanding of regular rate of pay, yes.
   16        Q.    What is your understanding as to how
   17   Hobart calculates the regular rate of pay for its
   18   hourly employees?
   19        A.    The regular rate of pay is essentially a
02:45 20   benchmark to determine the overtime compensation.
   21        Q.    To your knowledge, does Hobart include any
   22   additional compensation, such as the SPIFFs, when
   23   making its regular rate of pay calculation?
   24        A.    To my knowledge, to my understanding, yes,
02:46 25   we do include things like SPIFFs in regular rate.

1      Q.   How do you have that understanding?  Did

2  someone explain it to you?

3          And not lawyers, I don't want lawyers.  So

4  you stated that you are not the, perhaps,

02:46 5  compensation expert, I think were your words, it

6  could be different.

7          But did someone in HR or in payroll ever

8  explain to you how Hobart goes about its regular

9  rate of pay calculation?

02:46 10     A.   It has been explained to us so that we are

11  able to explain it to our employees in the sense

12  that we don't want to issue a SPIFF that an

13  employee has earned and have them be taken by

14  surprise that it's not a taxable earning.

02:47 15         So there is indeed a line item on each

16  employee's paycheck for these additional earnings,

17  and they are included in that and they are taxed

18  accordingly and they play into the regular rate in

19  accordance with our payroll system.

02:47 20         At the end of the day, it all goes into a

21  computer.  We input the data, and the calculations,

22  I am sure, are done appropriately.

23     Q.   When you say "we enter the data," are you

24  inputting the data?

02:47 25     A.   No.  The data is input -- hours worked,

Page 121

1   for example, are input by the branch manager

2   bimonthly, every other week for the hours worked.

3           Any additional earnings, such as a SPIFF,

4   are reported on a SPIFF distribution form, a very

02:48   5   simple form that includes the employee's

6   identification number, name, the reason for the

7   SPIFF and the denomination which they've earned.

8           That form is accompanied by backup

9   documentation.  It's signed by the branch manager

02:48   10   and the region manager.  And then after I sign it,

11   I forward it to our corporate office in Ohio for

12   further processing.

13           That's the time in which I understand it

14   would be input into the system for the employee's

02:48   15   earning.

16       Q.   Do you know what system is used for the

17   regular rate of pay calculation?

18       A.   I do not.

19       Q.   Software, do you know the software that

02:48   20   you use?

21       A.   I do not.

22       Q.   Do you know who is responsible at Hobart

23   for payroll?

24       A.   A gentleman named Jim Donauer [phonetic],

02:48   25   but he recently retired.  Cindy Richey,

3-26

```
                                                    Page 125
       1              (Reporter marked Exhibit No. 8 for
       2              identification.)
       3       Q.    BY MS. WORKMAN:  Sir, the court reporter
       4    has handed you what she has marked as Exhibit 8,
03:05  5    which is Bates labeled HS 00472.
       6              Do you see that document?
       7       A.    I do.
       8       Q.    Have you seen this document before today?
       9       A.    I have.
03:05 10       Q.    What do you understand it to be?
      11       A.    These are the -- I'll call them sanctioned
      12    SPIFFs as determined by the regional directors in
      13    2008.
      14              This was a program intended to standardize
03:06 15    our SPIFF program across all 50 states for all of
      16    our technicians to have additional earning
      17    opportunity based on these specific
      18    accomplishments.
      19       Q.    Does "SPIFF" stand for something?
03:06 20       A.    It's been said that it's special incentive
      21    for fine performance.  The letters don't exactly
      22    jibe, but the point is it is something you can earn
      23    for doing something in return.
      24       Q.    So this, "as determined by region
03:06 25    directors," would that include you?
```

Page 152

1          I have read the foregoing deposition

2     transcript and by signing hereafter, approve same.

3

4     Dated ___9/6/12_____.

5

6

7                              _____
                               (Signature) of Deponent)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                        Page 153
     1                 DEPOSITION OFFICER'S CERTIFICATE

     2     STATE OF CALIFORNIA    )
                                  ) ss.
     3     COUNTY OF SAN FRANCISCO )

     4

     5

     6          I, BALINDA DUNLAP , hereby certify:

     7          I am a duly qualified Certified Shorthand

     8     Reporter in the State of California, holder of

     9     Certificate Number CSR 10710 issued by the Court

    10     Reporters Board of California and which is in full force

    11     and effect.  (Fed. R. Civ. P. 28(a)).

    12          I am authorized to administer oaths or

    13     affirmations pursuant to California Code of Civil

    14     Procedure, Section 2093(b) and prior to being examined,

    15     the witness was first duly sworn by me.  (Fed. R. Civ.

    16     P. 28(a), 30(f)(1)).

    17          I am not a relative or employee or attorney or

    18     counsel of any of the parties, nor am I a relative or

    19     employee of such attorney or counsel, nor am I

    20     financially interested in this action.  (Fed. R. Civ. P.

    21     28).

    22          I am the deposition officer that

    23     stenographically recorded the testimony in the foregoing

    24     deposition and the foregoing transcript is a true record

    25                         / / /
```

3-29

Page 154

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3           Before completion of the deposition, review of

4   the transcript [XX] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated: AUGUST 20, 2012.

10

11

12                          _____

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 4

1    Thomas E. Hill (SBN 100861)
     Email: tehill@reedsmith.com
2    Mara D. Matheke (SBN 268869)
     Email: mmatheke@reedsmith.com
3    REED SMITH LLP
     355 South Grand Avenue, Suite 2900
4    Los Angeles, CA 90071-1514
     Telephone: (213) 457-8000
5    Facsimile: (213) 457-8080

6    Attorneys for Defendants
     HOBART SERVICE, a division of ITW
7    Food Equipment Group, LLC, and ITW
     FOOD EQUIPMENT GROUP, LLC

8

9               **UNITED STATE DISTRICT COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11    JOSELUIS ALCANTAR, on behalf of     )    Case No.: EDCV11-1600-PSG (SPx)
     himself and all others similarly situated, ) 
12                           )    [Honorable Philip S. Gutierrez]
13             Plaintiff,       )    **DECLARATION OF DAWN**
                          )    **BARHORST IN SUPPORT OF**
14        vs.                   )    **DEFENDANTS' MOTION FOR**
                          )    **SUMMARY JUDGMENT OR, IN**
15    HOBART SERVICE, HOBART FOOD   )    **THE ALTERNATIVE, PARTIAL**
     EQUIPMENT GROUP, ITW FOOD      )    **SUMMARY JUDGMENT**
16    EQUIPMENT GROUP LLC and Does 1   ) 
     through 100, inclusive,            )    Date:         December 17, 2012
17             Defendants.      )    Time:         1:30 p.m.
                          )    Place:        Court Room 880
18                           ) 
                          )    Compl. Filed:   October 5, 2011
19                           )    Trial Date:     January 22, 2013
20                           )

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**DECLARATION OF DAWN BARHORST**

I, Dawn Barhorst, declare:

1.     I make this declaration in support of the Motion For Summary Judgment Or, In The Alternative, Partial Summary Judgment of Defendants Hobart Service, a division of ITW Food Equipment Group, LLC ("Hobart"), and ITW Food Equipment Group, LLC ("ITW") (collectively, "Defendants"). I have personal knowledge of the facts set forth herein and, if called as a witness in this matter, I could and would competently so testify.

2.     I am currently employed by ITW as Hobart's Director of Human Resources, and I have been so employed since January 11, 2010. As an ITW employee and the Director of Human Resources for Hobart, I am generally familiar with ITW's and Hobart's business operations. As Hobart's Director of Human Resources, I provide human resources advice and support to Hobart's branch managers and service technicians in California and other states. To carry out my responsibilities, it is necessary for me to be familiar with, often apply, and sometimes help draft personnel policies applicable to Hobart's employees, including its California service technicians. It is also necessary for me to familiarize myself generally with Hobart's legal obligations as an employer in various states, including California, and to assist Hobart in complying with those obligations.

3.     ITW manufactures industrial equipment used for commercial food preparation, storage, production, clean-up and other processes and functions. Hobart is a division of ITW, and provides after-sale maintenance and repair services to the purchasers of ITW equipment. Those maintenance and repair services are provided in the field and at the customer's location by Hobart service technicians.

4.     Because the work of Hobart service technicians is performed in the field and on the premises of Hobart's customers, that work is generally done without any on-site supervision from Hobart management personnel.

5.     Hobart's service technicians are assigned to a Hobart branch office and

1    report directly to a Hobart branch manager.

2         6.    To perform their work in the field, Hobart provides its service technicians

3    with a service van equipped with tools, parts and other items necessary for their work.

4    Service technicians use their vans to travel to each service assignment. Every Hobart

5    service technician has the option to leave his service van at his branch office at the end

6    of the work day or, in the alternative, to take his service van home with him.

7         7.    A service technician who chooses to leave his service van at his branch

8    office at the end of the work day is not compensated for travel time associated with his

9    normal commute from the branch office to his home at the end of the work day.  For

10   those service technicians who choose to take their service vans home with them at the

11   end of the work day, a normal commute time is established by the branch manager and

12   the service technician based on the average time it takes the particular service

13   technician to travel from his home to his branch office, and from the branch office to

14   his home.

15        8.    Hobart compensates service technicians who take their service vans

16   home for all travel time associated with the commute from their home to their first

17   field assignment of the day, and the commute from their last field assignment to their

18   home, except for the normal commute time applicable to the technician.  Through this

19   policy, Hobart seeks to treat a service technician who chooses to take his service van

20   home with him comparably and equitably when compared to a service technician who

21   chooses to leave his service van at his branch office and commute to and from the

22   branch office in his own vehicle on a totally uncompensated basis.  All Hobart service

23   technicians are compensated for all non-commuting travel time during their work day.

24        9.    By choosing to use his Hobart service van to commute directly from

25   home to his first assignment of the day, and to home from his last assignment of the

26   day,  a service technician can save the fuel, maintenance and other costs that he might

27   incur if he used his own vehicle to commute to and from the branch office to pick up

28   or drop off his service van.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- 2 -
DECLARATION OF DAWN BARHORST

4-3

10.     Hobart maintains a company policy requiring its California service technicians to take off duty meal periods of at least 30 minutes as required by California law.  This policy has been in effect since well prior to October 2007, and has been and is regularly communicated to service technicians during the initial hiring process, and thereafter via Hobart's Personnel Policies and Procedures Manual, and by reminder communications from branch managers and Hobart's human resources representatives, including me.

11.     Hobart's service technicians are expected to keep accurate time records and to report any missed meal period or other overtime hours to their branch managers, and to record such time fully and accurately on their time records.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 29th day of October, 2012, at Troy, Ohio.

_Dawn Barhorst_
Dawn Barhorst

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- 3 -
DECLARATION OF DAWN BARHORST

# EXHIBIT 5

Thomas E. Hill (SBN 100861)
Email: tehill@reedsmith.com
Mara D. Matheke (SBN 268869)
Email: mmatheke@reedsmith.com
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071-1514
Telephone: (213) 457-8000
Facsimile: (213) 457-8080

Attorneys for Defendants
HOBART SERVICE, a division of ITW
Food Equipment Group, LLC, and ITW
FOOD EQUIPMENT GROUP, LLC

# UNITED STATE DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSELUIS ALCANTAR, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>HOBART SERVICE, HOBART FOOD EQUIPMENT GROUP, ITW FOOD EQUIPMENT GROUP LLC and Does 1 through 100, inclusive,<br><br>Defendants. | Case No.: EDCV11-1600-PSG (SPx)<br><br>[Honorable Philip S. Gutierrez]<br><br>**DECLARATION OF THOMAS E. HILL IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:       December 17, 2012<br>Time:      1:30 p.m.<br>Place:      Court Room 880<br><br>Compl. Filed:   October 5, 2011<br>Trial Date:       January 22, 2013 |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## DECLARATION OF THOMAS E. HILL

I, Thomas E. Hill, declare:

1. I have personal knowledge of the facts set forth in this declaration and, if called upon to do so, I could and would testify competently thereto while under oath.

2. I make this declaration in support of the Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (the "Motion") of Defendants Hobart Service, a division of ITW Food Equipment Group, LLC, and ITW Food Equipment Group, LLC.

3. I am an attorney at law duly licensed to practice before all courts in the State of California, and I am a partner with Reed Smith LLP ("Reed Smith"), counsel of record for Defendants in this matter.

4. On July 31, 2012, Plaintiff Joseluis Alcantar was deposed in this matter at Reed Smith's office, located at 355 South Grand Avenue, Suite 2900, Los Angeles, California. Mr. Alcantar was represented by counsel throughout the deposition proceedings. True and correct copies of excerpts and an exhibit from Mr. Alcantar's deposition transcript cited in the Motion are attached to Defendants' Compendium of Evidence ("COE") in support of the Motion as Exhibits 1 and 2.

5. On August 2, 2012, Michael Jewett was deposed in this matter at the office of Qualls & Workman, LLP, located at 177 Post Street, Suite 900, San Francisco, California. Mr. Jewett was represented by me throughout the deposition proceedings. True and correct copies of excerpts and an exhibit from Mr. Jewett's deposition transcript cited in the Motion are attached to the COE as Exhibits 3 and 6.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 29th day of October, 2012, at Los Angeles, California.

/s/ Thomas E. Hill
Thomas E. Hill

-1-

# EXHIBIT 6



# HOBART

# PERSONNEL POLICIES AND PROCEDURES

## Field Operations
## Non-exempt Employees



DEPOSITION
EXHIBIT
7
8/2/12 Jewett

JA 000385

This Handbook is not a contract, express or implied, guaranteeing employment for any specific duration. Although we hope that your employment relationship with us will be long-term, either you or the Company may terminate this relationship at any time, for any reason, with or without cause or notice. Please understand that no supervisor, manager, or representative of Hobart other than the President, the corporate legal department and applicable Director of Human Resources shall have the authority to enter into any agreement with you for employment for any specified period or to make any promises or commitments contrary to the foregoing. Further, any employment agreement entered into by the President, the corporate legal department and applicable Director of Human Resources shall not be enforceable unless it is in writing. This Handbook replaces all prior handbooks issued for Field Operations.

## Dear Non-Exempt Employee:

Welcome to Hobart Corporation (Hobart). We are pleased that you have decided to join us and are confident that you will find satisfaction in your association with Hobart.

To help you succeed in your new position, you should learn as much as possible about your role, responsibility & authority with our customers and our total business. Your immediate supervisor is the key to this communication and learning process, so please feel free to ask him or her for whatever information you need.

As a new non-exempt employee, it's also important for you to gain an understanding of the company's procedures, policies & practices; and this handbook provides some general guidelines. We urge you to review it along with the other employee information you are receiving now, and to retain it for future reference.

Again, welcome to Hobart and best wishes for your future success.

JA 000386

## A WORLDWIDE INDUSTRY LEADER . . .

Hobart is the leading supplier of equipment and systems for the foodservice and food retail industries. Hobart products serve the needs of restaurants, supermarkets and other food-related customers in more than 100 countries for refrigeration, food preparation, cooking, warewashing and weigh/wrap equipment, and bakery equipment.

Hobart products are manufactured in the United States, Canada, England, France and Germany.

Hobart, a company that is over 100 years old, is a part of Food Equipment Group, a division of ITW, a premier supplier of equipment, systems and service to the world's food industry. Food Equipment Group products are marketed under the brand names of Baxter, Berkel, Gaylord, Hobart, KelRak, Somat, Stero, Traulsen, Vulcan and Wittco.

A leading diversified manufacturing company with more than 85 years of history, Illinois Tool Works (ITW), designs and produces highly engineered fasteners and components, equipment and consumable systems, and a variety of specialty products and equipment for customers around the world. The Company's more than 500 decentralized business units in 40 countries collectively produce revenues by focusing on serving customers, by actively promoting teamwork with customers and suppliers. The more than 50,000 men and women of ITW continue to craft competitively superior products, solutions and work environments.

## OUR PHILOSOPHY

We believe . . .

* In providing our customers the highest possible quality of products and service
* In conducting all transactions with employees, customers, vendors and the community fairly, honestly, legally and ethically
* In providing a safe and pleasant working environment with opportunity for personal participation and growth
* In recognizing outstanding employee achievements and in promoting from within the company whenever possible or practical
* In providing competitive compensation and benefits
* In providing managers with the support needed to attain their planned objectives
* In delegating decision-making authority to the lowest feasible level of the organization

## EMPLOYEE RELATIONS

Hobart management has pledged itself to the highest standards of individual respect and fair treatment for all employees.

Your supervisor or the Manager at your work location is available to discuss any problems or issues of pay, benefits or working conditions that may arise in connection with your job.

Hobart policy is for management to be readily accessible to employees either individually or as groups.

## COMPANY POSITION ON LABOR UNIONS

As an employee of Hobart, it is vitally important that you know our position regarding labor unions.

We do not believe that a union is either desirable or necessary of our Company.

We recognize that in order to attract and retain the caliber of employees that are needed to insure our long-term growth, we must provide good jobs with competitive compensation and benefits. We must also pledge ourselves to the highest standards of individual treatment and respect for all our employees, providing avenues for the early resolution of problems which may arise.

Working together, we can continue to provide our customers with quality products at competitive prices, ensuring the sales growth that ultimately results in individual job security and fulfills our mission to be the premier supplier to the World's Food Industry.

We do not believe that the intrusion of a union in our business would be beneficial to either of us and if anyone should ask you to sign a union authorization card, we believe you should refuse to do so.

As a member of the Hobart team, you have our assurance that your welfare and job security are important to us and we are constantly striving to protect your interests.

JA 000387

# TABLE OF CONTENTS

INTRODUCTION ............................................ 1
   Our Mutual Interest .................................... 1
   Management Responsibility ........................ 1
   You and Your Supervisor ........................... 1
   Equal Employment Opportunity .................. 1
   Complaint Procedure .................................. 2
   Two-Way Communications .......................... 2
   Employee Relations ................................... 2
   Post-Offer Examinations ............................ 2
   Personnel Files ......................................... 2

PAY AND HOURS ........................................ 3
   General Pay Policy .................................... 3
   Payroll Information .................................... 3
   Working Hours ........................................... 3
   Lunch Period ............................................. 3
   Overtime ................................................... 3
   On-Call Pay ............................................... 4

BENEFITS .................................................. 4
   Holidays ................................................... 4
   Compensation for Holidays Worked ............ 5
   Vacation Plan ........................................... 5
   Vacation Year ........................................... 5
   Vacation Pay ............................................. 5
   Vacation Scheduling .................................. 5
   Vacation Pay with Break in Service ............ 5
   Group Insurance ....................................... 5
   Dental Insurance ...................................... 6
   Business Travel Insurance ......................... 6
   Pay Continuation for Medical Reasons ........ 6
   Short-Term Absences ................................ 6
   Long-Term Disability .................................. 6
   Retirement Benefits .................................. 6
   Retirement Savings Plan ............................ 7
   Military Plan ............................................. 7
   Bereavement Pay ...................................... 7
   Jury Duty .................................................. 7
   Educational Assistance .............................. 7
   Workers' Compensation ............................. 7
   Injury or Accident Pay ............................... 7
   Inclement Weather Policy ........................... 8

WORK PERFORMANCE ................................. 8
   Promotional Opportunities -
     Administrative and Clerical ..................... 8
   Promotional Opportunities -
     Service Technicians ............................... 8
   Hobart Image ........................................... 8
   Service Technician Training
     School Progression ................................ 8
   Performance Reviews ................................ 8

SERVICE & LEAVES OF ABSENCE ................. 9
   Length of Service ...................................... 9
   Resignation ............................................... 9
   Termination ............................................... 9
   Economic Work Force Adjustment ............... 9
   Leaves of Absence .................................... 9

WORKING RELATIONSHIPS .......................... 11
   Confidentiality of Information ..................... 11
   Resolving Disputes ................................... 11
   Self-Discipline and Regulation .................. 12
   Discipline ................................................. 13
   Solicitation and Distribution Policy ............ 13
   Attendance and Punctuality ....................... 13
   Appearance and Conduct .......................... 13
   Secondary Employment ............................. 14
   Personal Conduct ..................................... 14
   Drugs/Intoxicants ..................................... 14
   Automobile Parking ................................... 14
   Telephone Service .................................... 14
   Address and Telephone Record .................. 15
   Employment of Relatives ........................... 15

EMPLOYEE SERVICES ................................. 15
   Safety and Health ..................................... 15
   First Aid ................................................... 15
   Uniforms .................................................. 15
   Footwear .................................................. 15
   Office Equipment & Supplies ..................... 16
   Service Technician Tools ........................... 16
   Service Parts ............................................ 16
   Service Vehicle ......................................... 16
   Break-in or Theft of Vehicle ....................... 16
   Service Vehicle Accident ........................... 16
   Use of Personal Vehicle ............................ 16

HEALTH & SAFETY ..................................... 17
   Introduction ............................................. 18
   General Safety Rules ................................ 18
   Emergency Procedures .............................. 18
   Fire Safety ............................................... 18
   Workplace Violence ................................... 19
   Job Safety Instructions ............................. 19
   Manual Lifting & Handling of Materials ....... 20
   Ladders .................................................... 20
   Power Tool & Hand Tool Safety .................. 20
   Confined Space ........................................ 20
   Welding .................................................... 20
   Accident Reporting ................................... 21
   Bloodborne Pathogens ............................. 21
   Eye Protection .......................................... 21
   Hazardous Material – Hazard Communication ... 22
   Lockout Tagout – Hazardous Energy Control ... 22
   Fall Prevention ......................................... 22
   Material Handling Safety ............................ 23
   Electrical Safety ....................................... 23
   Hearing Conservation ............................... 23
   Construction Safety .................................. 23
   Motor Vehicle Operations .......................... 24
   Powered Industrial Vehicle Operation ........ 24

IN CONCLUSION ........................................ 24

SIGN-OFF SHEET ....................................... 25

JA 000388

# INTRODUCTION

## OUR MUTUAL INTEREST

At Hobart, we are all in the business of providing the customer with quality equipment and quality service. The equipment is offered to the public in direct competition with products of many other food equipment manufacturers. The success or failure of our products in the marketplace is a direct concern for each of us. If we do not properly provide the customer with the equipment and service desired, then the customer may turn to one of our competitors.

As employees, we share in sales success through good pay, excellent working conditions, more jobs and improved opportunities for advancement. In short, the sales and service of our products create and protect all our jobs.

A mutually rewarding relationship must be on a something-for-something basis. Therefore, your full skill, care, effort, intelligence, dependability and constructive attitude on the job are essential to our mutual success in operating a profitable, rewarding business.

## MANAGEMENT RESPONSIBILITY

The Managers of Hobart are held responsible by our Corporate Officers for the success and health of the business we all depend upon for our livelihood. In order to meet this obligation, the responsibility for running the business rests solely upon them, including the ultimate responsibility for employment, promotions, direction of the work force, determining methods of operation, assigning or directing people to work as needed, and for proper treatment of employees and administration of your company benefits.

## YOU AND YOUR SUPERVISOR

Your supervisor is responsible for the performance of your group and for supplying you with adequate direction, fair treatment, and answers to your questions.

Since supervisors are measured by the effectiveness of their organization, they are just as interested as you in your progress and assisting in solving job-related problems that may occur. They know they will have a stronger team if all members get fair and respectful treatment.

Each supervisor is a resource to assist in supporting your daily efforts. Their knowledge and experience are yours for the asking. But remember, they are human too. Give them the same consideration that you expect them to give you.

## EQUAL EMPLOYMENT OPPORTUNITY

Hobart is committed to the principles of Equal Employment Opportunity and Affirmative Action. This means that it is Hobart's policy not to discriminate against any employee or applicant in regard to employment, training, pay, promotions or any other conditions of employment because of that person's race, sex or sexual preference, religion, age, national origin, veteran or marital status and physical or mental disabilities.

In addition to this policy, it is also our desire to take affirmative action in these matters.

Hobart desires to provide an atmosphere of equal opportunity for all applicants and employees. Therefore, if you have questions, comments or concerns regarding any portion of Hobart's posture on Equal Employment Opportunity or Affirmative Action, please contact your immediate supervisor or Manager or your Human Resource Department.

Hobart expressly prohibits any form of unlawful employee harassment based on race, color, religion, sex, national origin, age, disability, or veteran or marital status. Improper interference with the ability of Hobart employees to perform their expected job duties is not tolerated.

With respect to sexual harassment, Hobart prohibits:

A. Unwelcome sexual advances; requests for sexual favors; and all other verbal or physical conduct of a sexual or otherwise offensive nature, especially where:
  - Submission to such conduct is made either explicitly or implicitly a term or condition of employment;
  - Submission to or rejection of such conduct is used as the basis for decisions affecting an individual's employment; or
  - Such conduct has the purpose or effect of creating an intimidating, hostile, or offensive working environment.

B. Offensive comments, jokes, innuendos, and other sexually oriented statements.

*Personnel Policies and Procedures*    1

JA 000389

## COMPLAINT PROCEDURE

Each member of management is responsible for creating an atmosphere free of discrimination and harassment, sexual or otherwise. Further, employees are responsible for respecting the rights of their co-workers.

If you experience any job-related harassment based on your sex, race, national origin, disability, or another factor, or believe you have been treated in an unlawful, discriminatory manner, promptly report the incident to your supervisor, who will investigate the matter and take appropriate action, including reporting it to the Human Resource Department. If you believe it would be inappropriate to discuss the matter with your supervisor, you may bypass your supervisor and report it directly to the head of your department or to the Human Resource Department who will undertake an investigation. Your complaint will be kept confidential to the maximum extent possible.

If the Company determines that an employee is guilty of harassing another employee, appropriate disciplinary action will be taken against the offending employee, up to and including termination of employment.

Hobart prohibits any form of retaliation against any employee for filing a bona fide complaint under this policy or for assisting in a complaint investigation. However, if, after investigating any complaint of harassment or unlawful discrimination, the Company determines that the complaint is not bona fide or that an employee has provided false information regarding the complaint, disciplinary action may be taken against the individual who filed the complaint or who gave the false information.

## TWO-WAY COMMUNICATIONS

We sincerely hope you will find your job at Hobart extremely rewarding. Your Management is dedicated to keeping you informed on factors which affect your job and the general operation of our business. Equally important, we want you to have the means of communicating directly with Management. Therefore, we conduct a variety of activities to stimulate a free flow of two-way communications. These include regularly scheduled Group Discussion Meetings with your Branch Manager and other members of management.

These two-way communication activities are meant to supplement the give-and-take of information in your daily associations with other people and with various levels of supervision. We urge you to use the many channels of communication available to you.

These channels exist so you can be knowledgeable about our business, our jobs, and our procedures. Just as important, these channels enable you to give your viewpoints to management, and provide you the chance to get answers to your concerns and problems. If you have any questions, ask your Supervisor—the best person from whom to get an answer.

## EMPLOYEE RELATIONS

In an effort to further open two-way communications, a Human Resource Department is assigned to your location. The Human Resource Department provides guidance and direction to all levels of management and employees on human resource issues.

## POST-OFFER EXAMINATIONS

As part of Hobart's employment procedures, an applicant is required to undergo a pre-offer drug screening and may be required to undergo a post-offer medical examination to be conducted by a lab/physician designated by the Company. Any offer of employment that an applicant receives from Hobart is contingent upon, among other things, satisfactory completion of these screenings and, a determination by Hobart that the applicant is capable of performing the responsibilities of the position that has been offered, with or without a reasonable accommodation.

In connection with these examinations, employees may be required to provide the Company with post-offer access to their medical records. All Company-required alcohol and drug screenings and post-offer medical examinations are paid for in full by the Company.

## PERSONNEL FILES

The Company maintains the primary personnel file on each employee at its headquarters in Troy, Ohio. This file contains documentation with respect to the employee's service with the Company, such as performance appraisals, disciplinary information and letters of commendation, if any. You may review your personnel file on an annual basis. If you are interested in reviewing your file, contact the applicable Human Resources representative at Troy, Ohio to schedule an appointment or request a copy or an update.

To ensure that your personnel file is up-to-date at all times, notify your supervisor or Human Resources in Troy of any changes in your name, telephone number, home address, marital status, number of dependents, scholastic achievements, the individuals to notify in case of an emergency, and so forth.

2

*Personnel Policies and Procedures*

JA 000390

# PAY AND HOURS

## GENERAL PAY POLICY

It is the policy of Hobart to establish and maintain fair pay which reflects such factors as local conditions, increased productivity, general business conditions and Hobart's ability to pay. Beyond this, it is the hope and intent of the Management that each employee make an honest, sincere effort to eliminate waste, to increase productivity, and to maintain and improve quality. If productivity is to increase, it means that employees must devote their working time to the performance of their duties. For quality to be maintained and improved, all employees must exercise the highest skills and seek the highest standards of workmanship.

Our pay must be competitive to attract and keep good employees. All positions have been assigned a pay grade level and pay range. Your Manager will discuss your individual pay grade and pay range, and be available for any questions you may have on this matter. The pay grade level, your pay position within that range and your level of performance all contribute to the frequency and amount of pay increase you are eligible to receive. Hobart is dedicated to paying its employees competitively. Ongoing wage surveys are conducted to insure competitiveness.

Your paycheck is actually only one part of your total Hobart compensation. Benefit plans, working conditions, and future opportunities must also be included and considered. And these are factors of which we at Hobart are proud.

## PAYROLL INFORMATION

For all employees whose first paycheck was paid after 9-22-06, your pay will be one week in arrears. Paydays are bi-weekly. Standard pay is 80 hours per day. Overtime will be paid in the next pay period. Other hours, such as vacation, will appear on your next pay stub.

Please consider direct deposit of your pay. Your money will be in your account on payday and you don't have to depend on the US mail for delivery of your check on time.

State taxes will be withheld for the state in which you work. If your residence is in a different state, and you want that state's taxes withheld, send Payroll a note stating you want your resident state taxes withheld.

## WORKING HOURS

The regular workweek will consist of 40 hours. Your office schedule may vary. While Hobart wishes to provide steady and regular employment, there is no guarantee of work per day or work per week.

## LUNCH PERIOD

The exact time for your lunch will vary depending on your location and the needs of the customer. All employees are required to take a lunch break. See your Manager or Dispatcher on scheduling an appropriate time for lunch.

## OVERTIME

You are expected to work overtime when the needs of the business require it. All overtime must be approved in advance by your supervisor. Unless state laws differ, overtime pay will be determined as follows:

A. Time and one-half (1½) for any work compensated for in excess of 40 hours in one week.

B. Double (2) time for any work performed on Sunday or the seventh day if Sunday is a regularly scheduled work day.

C. Double (2) time for any work performed on any paid holiday for which the Branch is closed (in addition to regular holiday pay).

D. If for training or business you are required to travel to a location other than your normal workplace during hours beyond the normal workday, you will be compensated at one and one-half (1½) times your base pay. Any travel time occurring during your scheduled work hours will be compensated at your base rate. Missed airline flights and delays may not be paid. "Travel time" is defined as regular air travel time and normal travel time to and from the airport as well as to and from the hotel. If you are required to travel on a Saturday, Sunday or a holiday, for a school starting on a Monday, the same restrictions apply.

E. If your branch management decides that you should drive rather than fly, you will be paid overtime only for the time you would have been paid if you had flown. Only personal vehicles should be driven to Troy or any other extended location where training is being conducted. Personal use

JA 000391

of a service vehicle can result in increased liability for the company as well as possible personal liability for the employee.

F. Any travel arrangements other than D or E above must be submitted in writing by the employee & Manager to HR for final approval.

G. Applicable overtime pay while included with your regular paycheck, may not be for overtime worked in the pay period immediately preceded by the check. Because of accounting procedures, overtime worked during the first monthly pay period may not appear until your end-of-the-month check.

## ON CALL PAY

Providing service to our customers goes beyond the limits of eight (8) hour days and forty (40) hour workweeks. In order to meet customer demands during "off-hours" in a most efficient manner, we follow a system of keeping one or more Service Technicians on a weekly "on-call" status.

When you are scheduled to be "on-call" you will receive a minimum of two (2) hours compensation per week at time and one-half (1½). This is in addition to any compensation received for any hours actually worked. Your Manager will determine the amount of "on-call" pay based on the duration that you are assigned to be "on-call" and the volume of calls you would typically receive.

If you are "on-call" and actually perform work on holidays during which the Branch is closed, you will receive double time for the time actually worked, in addition to the holiday pay. If you are "on-call" and actually perform work on an individually scheduled holiday, wherein the Branch is not closed, you will receive no extra compensation for any time worked during hours corresponding to the normal working hours of a normal workday. However, you will be given compensatory time off at the mutual convenience of Hobart and yourself. Normal "on-call" and overtime pay practices apply outside the normal working hours on an individually scheduled holiday. In all cases employees should be fully capable of performing work if on-call.

# BENEFITS

## HOLIDAYS

Hobart recognizes a total of twelve (12) paid holidays each year.

Branches observe six (6) national holidays each year. These holidays include: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas. Along with these, there are six (6) additional holidays that are observed on a local basis. Your Manager will review with you the local practice with regard to the scheduling of these additional holidays.

For the purpose of floater day accrual, an employee who is absent from work during any entire calendar month, will receive credit for that month if the absence is due to illness, injury or disability and the employee performs some work for Hobart during the calendar quarter in which the month falls.

New employees will be eligible for "floaters" as follows:

Hire Date Before 4/1 -
 ¾ of the days designated as "floaters".

Hire Date Before 7/1 -
 ½ of the days designated as "floaters".

Hire Date Before 10/1 -
 ¼ of the days designated as "floaters".

Payment for each holiday is made for up to eight (8) hours at your current pay.

The following are the requirements to be eligible for holiday pay:

A. You must have been on the active payroll during the week prior to the week in which the holiday falls.

B. You would otherwise have been scheduled to work on such a day if it had not been observed as a holiday.

C. Work the scheduled workday preceding and the scheduled workday following the holiday, unless excused by your supervisor.

D. When a holiday falls on a Saturday or Sunday, or on an alternate work schedule for full-time employees, Hobart will designate the day that your Branch will observe the holiday, keeping in mind service to the customer and needs of the employees.

4

*Personnel Policies and Procedures*

JA 000392

## COMPENSATION FOR HOLIDAYS WORKED

Providing continuous quality service to our customers is one of our prime objectives at all times. Many of our customers, such as restaurants, experience their busiest times on certain holidays. We need to be in a position to provide service to them during these periods of peak business. Therefore, it may be necessary to schedule someone to work during the holidays. If you are scheduled to work, you will be compensated as follows:

A. Employees who actually perform work on a holiday for which the Branch is closed, will receive double (2) time for the time actually worked, in addition to the holiday pay.

B. Employees who actually perform work on a holiday for which the Branch is not closed, will receive straight time earnings for time worked during hours corresponding to the normal working hours of a normal workday.

## VACATION PLAN

Vacations with pay shall be granted to employees in the employ of Hobart on June 30, the eligibility date as follows. The service below must be accrued by June 30th of each year.

| Service At Least: | But Less Than: | Number Weeks Vacation Pay: |
|---|---|---|
| 6 Months | 1 Year | 1 Week |
| 1 Year | 5 Years | 2 Weeks |
| 5 Years | 15 Years | 3 Weeks |
| 15 Years | 25 Years | 4 Weeks |
| 25 Years and over | | 5 Weeks |

## VACATION YEAR

Employees earn vacation benefits in the twelve (12) month period preceding July 1. An employee's eligibility for vacation benefits will be determined at the close of business on June 30, each year.

## VACATION PAY

Vacation pay for each eligible employee will be figured on the basis of a forty (40) hour week at the employee's straight time pay at the time of the employee's vacation. No vacation allowance will be carried over from one calendar year to the next (unless state law differs.)

## VACATION SCHEDULING

The Branch will schedule vacations in accordance with business needs. You are asked to schedule your vacation through your supervisor. Longer service employees will have preference on scheduled time off. Vacation days are to be taken from January through December. Since December is one of our busiest months, your Manager may request that all vacation time be taken prior to this month. At least one week of vacation should be taken in consecutive day periods.

## VACATION PAY WITH BREAK IN SERVICE

Proportionate vacation pay using the pay in effect at the time of break in service will be paid to employees whose active service during the vacation year was broken by layoff, illness, injury or disability; to employees who leave Hobart's employ during the vacation year because of ill health, physical disability, retirement, resignation, or termination for cause; and to the estate of any employee whose service during the vacation year is terminated by death. Employees in the above categories will receive one-twelfth (1/12) of their normal vacation pay for each calendar month or part of the month of active service during the vacation year.

## GROUP INSURANCE

Benefits are available on the first of the month following the start of your employment (unless you start on the 1st) to full time and part-time employees who are regularly scheduled to work 30 or more hours per week. Please refer to Summary Plan Description for details.

These benefit plans are contributory and have provisions for life insurance, accidental death and dismemberment, hospital and medical coverage, dental, as well as short and long term disability benefits. The medical, dental and life insurance benefits have coverage provisions for eligible dependents of employees.

## DENTAL INSURANCE

In addition to your Group Medical Coverage, a Dental Plan is available for full and part-time employees scheduled to work 30 or more hours per week. If dental benefits are elected, they become effective the first of the month following the start of your employment (unless you start on the 1st).

Your dental election is for a 2-year period.

The Dental Plan is designed to encourage you and your family to regularly receive preventive dental care and to help pay for this dental care. The Plan pays many "reasonable and customary" charges, on a fixed percentage basis, for many forms of dental service and treatments. Please refer to the current Summary Plan Description for details.

## BUSINESS TRAVEL ACCIDENT INSURANCE

Full time, active employees who travel on business for Hobart are covered at no cost by Business Travel Accident Insurance. Coverage provides benefits in the event of death, dismemberment, or loss of sight of an employee while traveling on business for Hobart. The plan is more completely described in your Summary Plan description.

## PAY CONTINUATION FOR MEDICAL REASONS (STD)

If you have an absence (over 5 consecutive working days) due to illness or injury verified by a doctor's statement, your pay may be continued. In such a case you may be eligible to receive a percentage of your pay for up to a maximum of 26 weeks. The percentage of your pay continued will be determined by the length of your service and the length of your disability.

To receive short-term disability (STD) benefits you must call the disability carrier's toll-free number to file a claim. You can call your Human Resources group in Troy for more information.

While on short-term disability, you are responsible for providing weekly updates on your condition to your supervisor and for notifying your Supervisor of your expected return to work date. Upon return to work, a doctor's release must be furnished to your Manager. Also, refer to "Termination" page 8.

Some states have disability plans that supercede Hobart's disability benefit program. Check with your Manager to verify the source of your short-term disability coverage.

Payments from other sources (i.e. Workers' Compensation or state disability) need to be reported by the employee because payroll will deduct these payments from STD checks. If not reported, you will be responsible for reimbursing the Company for any excess payments.

## SHORT-TERM ABSENCES

Regular attendance is expected of all employees. Short-term absences are very brief illnesses or up to a day for essential personal business. All tardiness or early departure from work will be considered a short-term absence. Your immediate Manager will determine whether the short-term absence is paid or unpaid. See Pay Continuation for Medical Reasons above.

Absenteeism or tardiness that is unexcused or excessive in the judgment of Hobart is grounds for disciplinary action, up to and including dismissal.

Absences that are used, without a valid medical reason, as an extension of weekends, vacations or holidays, will be considered an ABUSE of short-term absences. Short-term absences of three consecutive workdays or longer shall require a doctor's statement fully verifying illness or injury. Abuse of short-term absences will result in discipline up to and including termination.

Discipline may include restrictions on your future short-term absences.

Please refer to page 12, Self Discipline and Regulation and page 13, Attendance and Punctuality.

## LONG-TERM DISABILITY

Long term disability is a benefit designed to provide pay replacement, and in some instances continued benefits, after 26 weeks of short-term disability. The Long Term Disability Benefits are outlined in greater detail in the Summary Plan Description.

## RETIREMENT BENEFITS

Retirement benefits for employees have been established by ITW/Hobart. The overall Plan is under continuing study and is subject to modification from time to time. A schedule of retirement benefits provided by the Plan is set forth in the Summary Plan Description.

6

*Personnel Policies and Procedures*

JA 000394

## RETIREMENT SAVINGS PLAN

Both the employee and Hobart contribute to this tax-deferred vehicle. Please refer to the Summary Plan Description for Plan details.

## MILITARY PLAN

We comply with current federal requirements for employees who are military reservists. Please notify your Human Resources representative for more details.

## BEREAVEMENT PAY

If a death occurs in the family of a full-time regular employee, or an employee scheduled to work greater than 30 hours per week as a regular part-time employee of Hobart, the employee will be compensated at his or her base rate of pay for the time lost from their regular work schedule in accordance with the following guidelines:

* Up to three (3) days off to make arrangements and to attend funeral or memorial services when a death occurs in a person's immediate family. Hobart defines "immediate family" as the employee's spouse, parent, child, and sibling; the employee's spouse's parent, child or sibling; the employee's child's spouse; grandparents or grandchildren.
* In the event of the death of a relative not a member of the immediate family, as defined, the employee is encouraged to make arrangements for attendance to be covered by personal vacation time.

Any exception to the above policy should be discussed with the employee's immediate supervisor.

## JURY DUTY

If you are called to serve jury duty, or to appear in court in answer to a subpoena (unless you are a plaintiff, defendant, or other party in the court proceedings) and are a full-time employee, your current straight-time pay will continue. Any compensation you receive from the court for jury duty should be returned to the Payroll Department in Troy. The limit on such earnings is eight (8) hours a day and forty (40) hours a week, for as long as you are required to perform jury duty. You will also be granted similar make-up pay if you lose time from work because of an appearance in court in answer to a subpoena, except if you are a plaintiff, defendant, or other party in the court proceedings.

When on jury duty, your service is protected from any lost time. You must supply a statement from the court certifying the time you spent on jury duty and the fees received. When you are excused from jury duty during any part of the scheduled workday, you should immediately report to work and advise your Manager.

## EDUCATIONAL ASSISTANCE

Hobart has a plan for helping you further your education in areas that are job related. If you are interested, please contact your Manager or Human Resources for further details.

## WORKERS' COMPENSATION

Hobart complies fully with State Workers' Compensation laws if you are injured while at work. Any Workers' Comp. payments will be deducted from any additional payments you receive. Provisions are made for coverage against loss of life, limb or certain faculties as defined by law. All industrial accidents must immediately be reported to your Manager to ensure that the Company can assist you in obtaining appropriate medical treatment.

When off work for a workers' compensation injury, you must supply to your Manager a certificate of disability from your doctor. This certificate of disability should include a diagnosis and prognosis with an expected return-to-work date. Failure to return to work at the time designated by your doctor may result in termination. See Termination, page 9. During recovery, whenever possible, arrangements will be made to return to restricted duty as soon as possible providing that restricted work activity will not aggravate your medical condition or impose an undue hardship on the Company.

When you return to work you must furnish your Manager with a release from your doctor. This release should include any restrictions. Fraudulent claims will result in termination and prosecution.

## INJURY OR ACCIDENT PAY

In the case of injury or accident while at work during scheduled working hours, you will be paid for time lost from work due to medical treatment or care on the day of the accident or injury. If you are sent home by Hobart, or by the treating physician, you will be paid for the number of hours based on an eight (8) hour day that you were scheduled to work the day of the injury or accident.

JA 000395

## INCLEMENT WEATHER POLICY

Unless a facility is completely closed, employees are expected to come to work.

Each facility manager should decide whether to close down the facility during inclement weather. You will be notified of closings via radio, TV, or phone calls.

In the event that a facility is closed, non-exempt employees should be paid and the day will be coded as an excusable-payable one.

If the facility is not closed and an employee believes he/she is unable to get to work that day, they may elect 1) to take a floater day, vacation day, or a short-term absence day (if absence hours are still available, per policy), 2) they will not be paid and the absence will be coded "N — excusable non-payable."

If the facility is not closed and an employee is late coming in, absent hours may be recorded as short-term absence (if hours are still available), depending on the circumstances.

# WORK PERFORMANCE AND CAREER OPPORTUNITIES

## PROMOTIONAL OPPORTUNITIES – ADMINISTRATIVE AND CLERICAL

The wage and pay program is designed to allow you the opportunity to progress according to your ability. Hobart evaluates positions to ensure that the pay for each job classification is in the proper relationship to other positions. Pay increases depend on your individual performance. This program will determine and establish job specifications of positions and establish uniform performance requirements for measurement of progress.

## PROMOTIONAL OPPORTUNITIES – SERVICE TECHNICIANS

As a Service Technician the wage program provides you a personal program of advancement based on acquired Hobart experience, on-the-job performance, and completed Company schooling. The program is designed to advance you through the different grade levels, based on your own individual results as compared to the standards for the job classification. Pay growth is accomplished on a merit review basis. You will be reviewed on a set of annual goals and objectives that will support your overall facility's objectives. During this period, you will have the opportunity to correct your problem areas. Your Supervisor will always support you in your efforts to succeed.

## HOBART IMAGE

Your behavior is considered to be an important factor in determining your value as an employee. Positive behavior on-the-job helps to sell a favorable image of Hobart to your customers and allows for good working relationships with your co-workers.

## SERVICE TECHNICIAN TRAINING SCHOOL PROGRESSION

Your Supervisor will review with you the school schedule as it applies to your particular career program. It is required that Hobart Service Technicians attend our schools. Some of these schools extend up to 4 or 5 weeks, so it is important that you understand what is expected of you. Currently most of these schools are conducted at our training facility in Troy, Ohio. Some of your training can be accomplished by the use of video tapes available at the Branches. The final determination of your schedule will be with your Branch management.

## PERFORMANCE REVIEWS

To ensure that you perform your job to the best of your abilities, it is important that you be recognized for good performance and that you receive appropriate suggestions for improvement when necessary. Consistent with this goal, your performance will be evaluated by your supervisor on an ongoing basis.

All written performance reviews will be based on your overall performance in relation to your job responsibilities and will also take into account your conduct, demeanor, and record of attendance and tardiness.

In addition to the regular performance evaluations described above, special written performance evaluations may be conducted by your supervisor at any time to advise you of either the existence of performance or disciplinary problems or to commend you for exceptionally good performance.

JA 000396

# LENGTH OF SERVICE AND LEAVES OF ABSENCE

## LENGTH OF SERVICE

**Service:** Service is defined as the length of service with ITW/Hobart since your last date of employment. Your Service Date is important because it is used to determine your eligibility for certain benefits such as retirement benefit and vacation.

## RESIGNATION

The Company reserves the right to accept an employee's notice of resignation and to accelerate such notice and make the employee's resignation effective immediately, or on any other date prior to the employee's intended last day of work that the Company deems appropriate.

In such instances, the employee will be paid through the date designated by the employee in the letter of resignation as his or her intended last day of work, or for a two (2) week period, whichever is less.

## TERMINATION

mination of Service and Employment: Service .d employment may be terminated for any of the following reasons:

A. You resign or are terminated (see "Self-Discipline and Regulation").

B. You are absent from work for three (3) consecutive working days without approval of your Manager.

C. You fail to provide disability certification on a timely basis.

D. You falsify the reason for leave of absence or engage in other employment during the leave of absence.

E. Failure to return to work immediately following any leave of absence or disability.

F. Short-term Disability or non-paid leave of absence benefits are exhausted.

## ECONOMIC WORK FORCE ADJUSTMENT

Hobart employees at Branches have enjoyed relatively steady employment, even during periods of national economic recession. In the event that economic conditions would force us to reduce the size of our work force in any Branch, jobs necessary to continue the operation as determined by management would be identified.

## LEAVES OF ABSENCE

A. Family Leave: Family leave may be granted based upon either federal or state law and applicable regulations.

The Family and Medical Leave Act requires companies to provide employees with up to 12 weeks of unpaid leave for a variety of family and medical reasons. You already receive paid time off benefits for many of these reasons. Under some circumstances such as birth or adoption of a child, or when family members become seriously ill · FMLA provisions might make a difference.

### Taking an FMLA Leave

If you've been employed with the Company for at least 12 months and worked at least 1,250 hours over the previous 12 months, you are eligible to take an FMLA leave. You may take an FMLA leave for one or more of the following reasons:

* Birth of your child and care for your child following birth (leave must be completed within 12 months of the child's birth);
* Care for your child following adoption (leave must be completed within 12 months of adopting the child);
* Care for a child placed in your foster care;
* Care for your child, spouse, or parent (but not parent-in-law) who has a serious health condition; or
* Your own serious health condition.

If you have been employed at the Company for less than 12 months you may be eligible for paid short-term disability for personal medical reasons only.

9

JA 000397

6-13

If you and your spouse both work for our company, you're limited to a total of 12 weeks of FMLA leave between the two of you for birth or adoption of a child, or to care for a seriously ill parent. You and your spouse are entitled to separate 12-week periods to care for a seriously ill child or spouse, or your own serious illness.

### Serious Health Condition

Under FMLA, a "serious health condition" is defined as an illness, injury, or physical or mental impairment that involves:

* Any inpatient treatment in a hospital, hospice, or other residential medical care facility;
* Any absence of more than three days from work, school, or other regular daily activities, provided that the person is under the direct care or supervision of a health care professional;
* Any continuing treatment for a chronic or long-term health condition that, if untreated, is likely to result in incapacity of more than three calendar days; or
* Prenatal care.

### Family Members

Family members include your spouse, sons or daughters, and parents. Your spouse is someone to whom you are legally married. The law states that a son or daughter is a child who is biological, adopted, a foster child or legal ward, a stepchild, or a child for whom you take the place of a parent. Your children do not have to live with you, be covered under the Company sponsored benefit plans, or be your dependents for tax purposes. However, they must be under age 18 or over age 18 and disabled.

FMLA states that a parent is your biological parent or an individual who assumed responsibility for your care in the absence of supervision by your natural parent (e.g., adoptive parent), but not a parent-in-law.

### Your Responsibilities

You're responsible for paying eligible costs for initial certification of the leave as well as continuing proof of a serious health condition, if required. (Charges for office visits or other exams may be covered under your medical plan.) The Company is responsible for paying any charges related to second or third opinions.

Once your leave begins you may be required to provide occasional updates about your status and your intent to return to work. Also, if your leave is for ongoing medical treatment, you will be asked to

schedule treatment, to the extent possible, in such a way that it does not limit your time away from work.

### Continuation of Benefits During a Family or Medical Leave

While you're on leave, your health care benefits (medical, dental and health care spending) will continue. Normally, your coverage contributions are deducted from your pay. However, since FMLA leaves are unpaid, you will need to make arrangements to continue making contributions for your coverage while on an unpaid leave. You can either pre-pay the employee cost of benefits prior to the start of the leave or make payments monthly while you are on leave.

Your medical coverage will end if:

* You notify the company in writing that you do not intend to return to work; or
* You fail to return from your leave after 12 weeks.
* You fail to make premium payments on a timely basis.

During your family or medical leave, you will continue to earn service under the retirement plan.

### Coordinating FMLA Leave With Other Types of Leave

You receive vacation time and short-term disability benefits if you need time off because you become ill or injured, following the birth or adoption of a child, or take vacation. If you plan to take an FMLA leave, you must first use any vacation or short-term disability paid time off benefits for which you're eligible. STD benefits apply only for your own serious health condition - you may not receive STD benefits to care for a sick child, spouse, or parent, or for the birth or adoption of your child.

Short-term (or casual) absences which are limited to 40 hours every "rolling 12 months" and floating holidays will not be considered as part of this provision. Short-term (or casual) absences are paid absences (with supervisory approval) for personal illness, family illness or personal business reasons. These absences will always be 5 consecutive days or less.

You may however, save up to 5 (five) vacation days for reasons other than a family or medical leave. For example, if you are eligible for two weeks of vacation days, you may save five of those days and then must use the remaining paid time off toward a family or medical leave. Your paid and unpaid time off combined cannot be more than the maximum 12 weeks allowed for the family or medical leave.

*Personnel Policies and Procedures*

JA 000398

### How a Leave May Be Taken

Depending on the reason for your family medical leave, you may take your leave:

- In a continuous period of time to care for a child following birth or adoption. If you decide to take a six-week leave following a birth or adoption, you will still be eligible for an additional six weeks to be used for another family or medical leave reason. (You would not, however, be able to take another six week leave to provide care for your child since FMLA for birth or adoption of a child must be taken in a continuous period.)
- Intermittently or on a reduced schedule to care for your spouse, child, or parent who has a serious illness, or for your own illness.

### Returning to Work

FMLA ensures that you can take a family or medical leave and return to the same or similar position after the leave. You will not be discriminated against for requesting an FMLA leave. When you return, you'll be restored to your original job, or if not possible, to an equal job with equal pay, benefits, and other terms and conditions of employment.

### Final Word

This memo is a summary of the Family and Medical Leave Act of 1993 and the ITW Family and Medical Leave Policy (the "Policy") to comply with this Act. A more complete description can be found in the Policy and in the Act. Every effort has been made to provide you with an accurate summary of the Family and Medical Leave Act. However, if there is any inconsistency between this material or the Policy, and the requirements of the Act, the Act will govern.

B. Other Leaves of Absence: Unless state regulations instruct otherwise, leaves of absence may be granted by a Branch Manager and Region Manager under special circumstances for a period not to exceed thirty (30) calendar days, provided your absence will not interfere with job requirements. A leave of absence beyond 30 days requires the written permission of the applicable Human Resources Director and applicable Head of the Division. Leaves of absence cannot be granted for self-employment or for any other employment.

C. Without Pay: All non-medical leaves of absence will be without pay and must be applied for and approved by the Branch Manager. Employees who misrepresent facts to obtain a leave of absence or secure a leave of absence on the basis of misrepresentation may be dismissed by Hobart. Failure to return from a leave of absence without a sufficient excuse or an approved extension of your leave may result in termination of your employment by Hobart.

## WORKING RELATIONSHIPS

### CONFIDENTIALITY OF INFORMATION

It is the policy of Hobart to ensure that the operations, activities, and business affairs of the Company and our customers are kept confidential to the greatest possible extent. If, during the course of their employment, employees acquire confidential or proprietary information about Hobart and its customers, such information is to be handled in strict confidence and not to be discussed with outsiders. Employees are also responsible for the protection of documents containing such information.

Employees may be asked to sign a statement of confidentiality at the time of hire and periodically throughout their terms of employment to acknowledge their awareness of, and to reaffirm their commitment to, this policy.

Employees found to be violating this policy are subject to disciplinary action, up to and including termination, and may also be subject to civil and/or criminal penalties for violations.

### RESOLVING DISPUTES

In any work situation, questions or concerns and occasional misunderstandings are bound to occur. When you have a complaint or concern, your Supervisor or Manager wants you to bring it up and discuss it frankly with them.

Because most questions and problems arise on your job, you should first take any matter up with your immediate Supervisor. You and your Supervisor depend on each other to accomplish your job objectives.

*Personnel Policies and Procedures*                                    11

JA 000399

6-15

However, if you decide that you have a problem that has not, nor cannot be handled in the normal routine manner with your Supervisor, the following procedure is available for your use

A. Request that a meeting be set up between you and your Supervisor in order for you to formally present your complaint.

In some situations, you and your Supervisor may not be able to resolve your problem to your satisfaction. If this happens, or if your problem is a "personal" conflict or disciplinary in nature utilize the next step.

B. Request that a meeting be set up between you and the next higher level of management. Your Supervisor will make arrangements for this meeting. The next level of management will review the facts of the case with you and will make every effort possible to get back to you as quickly as possible after your initial discussion. If resolution to the problem is still not reached, utilize step C.

C. Request a discussion with the applicable Human Resources Director. All pertinent facts will again be reviewed and an answer will be provided in a reasonable amount of time. It is important to note that Hobart management encourages you to utilize this program without fear of retribution.

Remember, we want our employees to feel they are being treated fairly. It is recommended you first work through your local Supervisor or Manager to resolve the problem. If that is not possible, you can contact the applicable Human Resources Director.

If you have a complaint, speak your mind. Don't let it simmer. Anyone who is preoccupied with a problem can't perform their best. We will offer a prompt, impartial means of dealing with your problem. You'll find we are a lot more concerned with "what is right" then "who is right"?

## SELF-DISCIPLINE AND REGULATION

The goal of Hobart and all its employees should be the manufacture, distribution and service of top quality products that are offered for sale in the marketplace. To help achieve this goal, we all must operate in an efficient and orderly manner. Efficiency and orderliness don't just happen; they are achieved as a result of all members of the Hobart team disciplining themselves to follow procedures and regulations which are established for the convenience and protection of all employees.

Fortunately, the vast majority of Hobart employees have the desire and self-discipline to meet the expectations listed above, as well as the other conditions described in this booklet.

Falsification of personal or company records will result in immediate termination.

Violation of these items may be grounds for immediate termination.

- Abuse, destruction or theft of property of Hobart, its employees and its customers.
- Conviction of a felony.
- Disregard for safety or creation of unsafe conditions including violating safety rules and traffic regulations when operating company vehicles.
- Abuse/harassment of other persons because of race, ethnic, color, sex, marital status, sexual preferences, veterans status or disability.
- Unauthorized selling, solicitation or collection of any kind during working hours.
- Possession of, or under the influence of, intoxicants or drugs while involved in any activity in which Hobart representation is required or implied.

Violation of these items listed may lead to discipline up to and including termination.

- Chronic absenteeism, tardiness and failure to notify your Manager in the event of absence.
- Conviction of a misdemeanor when the subject matter reflects on Hobart employment.
- Insubordination or failure to perform work in a satisfactory manner as defined by your objectives.
- Commitment of Hobart funds or contracting in the name of Hobart without authorization.
- Operation of a service vehicle for personal use.
- Violation of federal, state or local laws.
- Distribution of unauthorized written or printed material of any kind during working time or in work areas.
- Possession of guns or other like weapons on Hobart or Customer property or in Hobart vehicles.
- Gambling of any kind on Hobart or Customer property.
- Use of profane and/or offensive language on Hobart or Customer premises or while representing Hobart.

12

*Personnel Policies and Procedures*

JA 000400

## DISCIPLINE

Hobart realizes that disciplinary action or the termination of an employee is a very serious matter. In the event of a violation of Hobart rules and/or practices or of other conduct requiring disciplinary action, any of the following penalties may be imposed according to the frequency and seriousness of the offense.

A. A verbal counseling.

B. A written warning.

C. Suspension without pay for up to 30 days.

D. Suspension of use of Hobart vehicle.

E. Suspension with pay if the situation warrants investigation.

F. Termination of employment.

Any of the above disciplinary actions may be taken without invoking a lesser disciplinary action.

In addition, Hobart believes strongly in the Personal Development Program which is designed to assist an employee in improving their level of performance. The Manager and employee work together in trying to resolve performance issues and communicate frequently regarding the status of the employee's improvement.

## SOLICITATION AND DISTRIBUTION POLICY

Employees may be allowed to solicit or distribute literature during non-working times in non-working areas. All other solicitation and distribution are prohibited.

It is important that everyone understand our solicitation and distribution policy in order that the rights of everyone are protected. Moreover, this clarification is in order that we may give our undivided attention to the important job of providing excellence in the service and sales of our products.

## ATTENDANCE AND PUNCTUALITY

The job security of every employee depends on how efficiently we run this Branch. One of the most important contributions that each of us can make to efficient operation of this Branch is to report for work regularly and to be on time. Being on time means that we should be at our job assignment ready for work at the regular starting time and remain on the job until quitting time.

Regular attendance and punctuality is important to you personally. It establishes a good work record, and is an excellent means of gaining recognition

and opportunity for advancement. In order to avoid inconvenience to the customer, your Supervisor, fellow workers, and yourself, we ask you to comply with the following:

A. Absence or tardiness for any reason must be reported as soon as possible and preferably before the start of the workday. Report in the following manner:

1. Call your Manager as soon as you know that you will be absent or late. If your Manager is not available, ask to speak to a designated member of management. Calling to an answering service does not relieve you of your obligation to inform your Manager.

2. Give the reason for your absence or lateness and the approximate date of return to work, or time of arrival if it is lateness.

3. When you return to work after being late or absent, you are required to report to your Manager before starting work.

B. Merely reporting an absence or lateness does not necessarily offer a proper excuse. Unreported absence or lateness, or reported absence or lateness for unacceptable reasons may, with management discretion, result in non payment of the time off or, disciplinary action up to and including termination. (See also page 6 Short-Term Absences.)

C. If you are absent for three or more consecutive working days because of illness or injury, you must first receive clearance and approval from your Manager before returning to work. For your own protection, we will insist that you have medical clearance before allowing you to work.

## APPEARANCE AND CONDUCT

As one of our main links with our customers, it is you who create an impression of Hobart. Please make sure that the impression is a good one. Displays of attitudes or behavior that downgrade Hobart products and/or other employees, at customer locations, will not be tolerated. We expect you to conduct yourself properly and courteously. This includes, keeping yourself well groomed and wearing appropriate dress (uniform if assigned). Employees required to wear uniforms are expected to wear them properly and in their entirety. Uniforms must be clean, pressed, and neatly maintained at all times. Appropriate shoes must be in good condition and polished or brushed clean. Hair length and facial hair should be clean, neat and maintained at a proper length to be consistent with Hobart's quality image.

JA 000401

## SECONDARY EMPLOYMENT

Our rules and regulations on this point are all based on the theory that to be a good service technician, clerk, or salesperson, etc., is a full time job. To do the job properly, requires your full attention and consideration. Overtime may be required of all employees. Therefore, you must be available to work at management request.

If you want to do other types of part-time work on your own time, talk it over with your Supervisor beforehand.

Acting as an independent contractor or for another company in competition with Hobart sales and service will result in disciplinary action up to and including termination.

## PERSONAL CONDUCT

We are all expected to follow a code of conduct that will reflect well on Hobart, our community and ourselves.

In recent years, the use and abuse of alcohol and drugs has directly affected some of our employees and their families.

We are dedicated to maintaining a drug and alcohol-free workplace and are pledged to assist any employee who currently has a substance abuse problem. Some of our customers have drug and alcohol-free workplace standards with which Hobart employees must comply when on the customer's premises.

We perform drug testing as a regular part of our employment screening and evaluation program. Failure to successfully complete the test could result in termination.

We will provide support for employees who request assistance in overcoming a drug or alcohol problem. If you are enrolled in a company-sponsored medical plan, these services may be covered. Please refer to your Benefit Summary Plan Description. The request for assistance must be made voluntarily and prior to the request for testing or disclosure of abuse of alcohol and drugs by company testing.

We will require testing of any employees whose activities or actions are such that they are endangering either themselves or fellow employees or give good reason to suspect drug or alcohol use by such employees. If the test results are positive with respect to use of alcohol or drugs, disciplinary action up to and including discharge will result.

We will terminate the services of any employee who fails to comply with the guidelines of a rehabilitation program which he/she has voluntarily entered.

We will absolutely terminate the services of any employee engaged in the sale and/or supply of controlled substances on Hobart property, and, where appropriate, we will work closely with local authorities to seek convictions for illegal activities.

We believe our facility should be drug free in keeping with the Drug-Free Workplace Act of 1988 and we are pledged to work with you to maintain a workplace with which you are proud to be associated.

## DRUGS/INTOXICANTS

Each employee may be tested for drugs and alcohol after a work-related accident, if he/she has been observed using a prohibited substance on the job, if he/she exhibits a severe and prolonged reduction in productivity, or if the Company has other reasonable cause for testing him/her. An employee who fails to submit to required testing or who tests positive will be subject to discipline, including termination.

## AUTOMOBILE PARKING

Where possible, Hobart will provide parking space for the convenience of its employees. You are requested to exercise caution when parking your, or Hobart vehicle, to prevent either personal injury or damage to other parked automobiles. Caution must also be used when leaving the parking area at the end of the work day to avoid injury to any of the employees leaving the Branch. Ask your Manager for directions to park at your facility because many Hobart facilities reserve parking spaces for customers and for employees with special needs.

## TELEPHONE SERVICE

Telephone service has been provided in different areas of the Branch. These telephones are intended to be used for Hobart business and are not for personal use.

Personal calls for employees from outside sources should be kept to a minimum and for emergency reasons only.

14                                    *Personnel Policies and Procedures*

JA 000402

## ADDRESS AND TELEPHONE RECORD

It is very important that the Branch have a record of your current address and telephone number in the office. There may be occasions when it is necessary to write or call you at home concerning working conditions or working schedules. Since such communications can be made only to the address or telephone number that is recorded, it is your responsibility to inform your Supervisor of any change in address or telephone number. This should be done immediately after any change occurs.

## EMPLOYMENT OF RELATIVES

Hobart permits the employment of qualified relatives of employees or people in the same household as long as such employment does not, in the opinion of Hobart, create actual or perceived conflicts of interest. Hobart will exercise sound business judgement in the placement of related employees in accordance with the following guidelines:

- Individuals who are related by blood or marriage or living in the same household are permitted to work in the same Hobart facility, provided no

direct reporting or supervisor/management relationship exists. That is, no employee is permitted to work within the "chain of command" of a relative or person living in the same household such that one employee's work responsibilities, pay or career progress could be influenced by the other employee.

- No relatives or persons living within the same household are permitted to work in the same department or in any other positions in which Hobart believes an inherent conflict of interest may exist.

- Employees who enter into a relationship such as described above while employed are treated in accordance with these guidelines. That is, if in the opinion of Hobart a conflict or a potential conflict arises as a result of the relationship, one of the employees will be transferred or terminated at the earliest practicable time.

This policy applies to all categories of employment at Hobart, including regular, temporary and part-time classifications.

- Relationships described above that currently exist as of 3-1-96 are grandfathered.

# EMPLOYEE SERVICES

## SAFETY AND HEALTH

Hobart will continue to make reasonable provisions for the health and safety of the employees and will use its best efforts to insure that safe working conditions are maintained at all times. Protective devices and equipment deemed necessary to protect employees from injury or illness will be provided by Hobart. Employees will be required to use such devices and equipment as well as to abide by the rules and regulations which have been established or may be established to protect and promote the safety of themselves and their fellow workers. Please refer to the Health & Safety section of this manual. Employees should be familiar with and comply with the safety rules of Hobart customers for whom the employees are providing service.

## FIRST AID

The Branch has available a first-aid kit for your protection. In the event medical treatment is needed, it is available through a medical clinic designated by your Manager.

## UNIFORMS

Details on uniforms for Service Technicians and Parts employees vary from Branch to Branch depending on such things as local weather conditions and availability of uniform services. Your Manager will review with you the particular program set up for your Branch.

## FOOTWEAR

It is the policy of Hobart to ensure a safe working environment. Because of this, we require all Service Technicians, advisors and Parts personnel to wear an all leather, hard interior toe capped shoe. Since tennis shoes provide minimal protection for foot injuries, we do not allow this type of footwear to be used. There will be no specific brand of shoe required and no shoe allowance will be given.

JA 000403

## OFFICE EQUIPMENT AND SUPPLIES

Office equipment and supplies are to be handled properly at all times. Take care to maintain your equipment and report damage or broken office equipment immediately to your Manager.

## SERVICE TECHNICIAN TOOLS

You may be assigned special tools for working on Hobart equipment and these tools remain Hobart property. We feel that a Service Technician cannot properly service the equipment unless the proper tools are available at all times. Therefore, it is your responsibility to ensure that the full inventory of assigned tools be maintained. Your Supervisor will review the tool inventory program with you. Loss or breakage must be reported to your Supervisor immediately. You are responsible for the replacement of any tool lost or stolen through your negligence. Hobart will replace any tool that is broken in the performance of the job.

Hobart tools are insured against theft but only when theft results from forced entry to a vehicle or workshop. Consequently, you must ensure that your vehicle is securely locked when it is left unattended.

All tools must be returned upon your employment termination.

## SERVICE PARTS

Adequate storage has been provided for the parts to be carried by part number. Please make sure that this is done. You are supplied with the stock status computer printouts detailing the parts, quantities and list prices and procedures for establishing and maintaining your truck parts inventory. Please check with your Supervisor for specific details on this procedure.

## SERVICE VEHICLE

Please remember that the vehicle you drive is also a traveling advertisement for Hobart and it is your responsibility to see to it that your road manners and the state of cleanliness of the vehicle ensure that it is a good advertisement and under no circumstance should the signage be altered. This vehicle is provided to you for business purposes only. When you consider the high dollar value of the truck parts inventory, the value of the tools, along with the information contained in the technical bulletins you are required to carry, you can understand why the use of the

vehicle is limited to business purposes only. Therefore it is necessary that we require that this vehicle not be operated for personal use. You will be required to sign a Vehicle Understanding form and to provide evidence of a valid driver's license for the primary state in which you will be working before the vehicle is issued. Operation of this vehicle for personal use or under the influence/possession of alcohol and/or drugs will necessitate disciplinary action up to and including termination.

## BREAK-IN OR THEFT OF VEHICLE

If the vehicle is broken into or stolen, report it to the police immediately and then to your Supervisor as soon as possible. Your Supervisor has the appropriate insurance claim forms. Personal items and tools carried in a Hobart vehicle are not covered by insurance.

## SERVICE VEHICLE ACCIDENT

If you are involved in an accident with your service vehicle, report it to the police immediately. Police reports are important in future accident claims and litigation. Contact your Supervisor as soon as possible for further instructions.

You must not admit fault to anyone, including the police. You should not provide information (except as required by law) to anyone other than a representative of Hobart's insurance carrier. Hobart service vehicles are insured while in execution of Hobart duties. There is no coverage for personal use. All vehicle accidents are to be reported immediately to our insurance representatives. You are to make certain the service vehicle you operate has proof of insurance (ID card) available. No personal effects, tools, or vehicles are insured under Hobart's auto insurance policy.

Your driver's license record is subject to examination at any time.

## USE OF PERSONAL VEHICLE

On those few occasions when you are authorized by your Manager to use your own personal vehicle for Hobart business you will be reimbursed under the standard mileage rate authorized by Hobart. You are responsible for carrying your own insurance on your personal vehicle and will not be reimbursed for damage to your personal vehicle arising out of an accident while on Hobart time. The standard mileage rate includes an allowance for depreciation, gasoline, maintenance, insurance premium, etc

16

*Personnel Policies and Procedures*